PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3658
_____

RICARDO JAVIER BLANCO,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A201-664-023)
Immigration Judge:  D'Anna H. Freeman
_____

Argued April 23, 2020
Before:  PORTER, RENDELL and FISHER, *Circuit Judges*.

(Opinion Filed:  July 24, 2020)

Gary H. Levin
Aaron B. Rabinowitz  [Argued]
Baker & Hostetler
2929 Arch Street

12th Floor, Cira Centre
Philadelphia, PA 19104
        *Counsel for Petitioner*

Joseph H. Hunt, Assistant Attorney General
Bernard A. Joseph, Senior Litigation Counsel
Enitan Otunla  [Argued]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

————

OPINION OF THE COURT

————

FISHER, *Circuit Judge*.

Ricardo Javier Blanco, a citizen of Honduras, is a member of Honduras's Liberty and Refoundation ("LIBRE") Party, an anti-corruption political party that opposes the current Honduran president. After participating in six political marches, he was abducted by the Honduran police and beaten, on and off, for twelve hours. He was let go but received death threats over the next several months until he fled to the United States. He applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied all relief, and the Board of Immigration Appeals ("BIA") affirmed.

Blanco now petitions for review of the agency's decision, arguing that the BIA and IJ erred in denying his

2

asylum and withholding of removal claims on the basis that his treatment did not rise to the level of persecution. He also argues that it was improper to require him to corroborate his testimony to prove his CAT claim. Because the agency misapplied our precedent when determining whether Blanco had established past persecution, and because it did not follow the three-part inquiry we established in *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001), before requiring Blanco to corroborate his CAT claim testimony, we will grant the petition, vacate the BIA's decision, and remand for further proceedings.

## I.  Background

### A.  Blanco's Experience in Honduras

Ricardo Blanco is a citizen of Honduras. Beginning in 2016, Blanco participated in six marches with the LIBRE Party, an anti-corruption political party. Blanco's sixth march was on November 27, 2017, the day after Juan Orlando Hernández—whom the LIBRE Party opposed—won the presidential election. At that march, four Honduran police officers arrested Blanco, put a mask over his head, and took him to an abandoned house. They held him at the house for approximately twelve hours and beat him multiple times, for forty to sixty minutes each time. During the beatings, the police threatened to kill Blanco and his family and warned him not to participate in any further LIBRE Party marches. They also used racial slurs against Blanco. After the twelve hours, they left him in an abandoned lot. From there, he was taken to a hospital for evaluation. He did not have any bruises, cuts, or broken bones, and he was given acetaminophen and released.

The next day, Blanco learned that other march participants had also been abducted by the police and at least one of them had been killed. He also heard from a neighbor

3

that the day after the march, while he was staying at his mother-in-law's house, the police entered his home to look for him.

Blanco remained in Honduras for about fourteen months and did not participate in any further LIBRE Party activities. He moved from city to city, but the police continued to look for him and send him threats. Specifically, Blanco received three letters and a phone call warning him that because of his political views, he and his family would be killed if he did not leave Honduras. Blanco also learned that some of the LIBRE Party members who had participated in the marches had been killed after receiving similar letters. The last letter Blanco received was in December 2018, and in January 2019, Blanco fled Honduras for the United States. His mother, young daughter, and daughter's mother remain in Honduras and, so far as the record shows, have not been harmed.

## B. Procedural History

Soon after leaving Honduras, Blanco was taken into custody by United States border patrol in Texas. Blanco informed border patrol that he was seeking asylum, withholding of removal, and protection under the CAT. The asylum officer who interviewed Blanco found his testimony credible. The Department of Homeland Security issued a Notice to Appear charging Blanco with removability as an alien who entered the United States without admission or parole and who has applied for admission but lacks an entry permit. 8 U.S.C. § 1182(a)(6)(A)(i); *id.* § 1182(a)(7)(A)(i)(I). Blanco then applied for asylum, withholding of removal, and CAT protection.

The IJ denied Blanco's application and found him removable. The IJ found Blanco's testimony credible, stating that he was "mostly consistent" except that "his testimony regarding who sent the letters and made the phone call

4

threatening him" "appear[ed] to be speculation." App. 45. Nevertheless, the IJ held that Blanco's experiences did not rise to the level of past persecution on account of his political opinion or race because: (1) his "beating was not severe and did not end with any serious physical injuries," and (2) the officers did not "follow up" on their threats and Blanco "remained in the country for 14 or 15 months after the November 2017 incident and was not harmed again." App. 46. The IJ also found that Blanco did not establish a well-founded fear of future persecution because "it appear[ed] . . . that [the police] met their goal of preventing [Blanco] through intimidation from participating in any more political activities" and did not follow through on their threats. App. 47. Because Blanco did not establish that he was eligible for asylum, the IJ found that he necessarily failed to satisfy the higher standard for withholding of removal.

Lastly, the IJ concluded that Blanco failed to meet his burden under the CAT because he did not establish that it was more likely than not that he would be tortured if returned to Honduras. Blanco testified that his name was on an official government list of opposition members, but the IJ stated that there was "nothing in the Country Reports to corroborate this and [Blanco] ha[d] not provided any corroborating evidence." App. 47. Additionally, the IJ pointed to the facts that the election is over and that Blanco remained in Honduras for fourteen months after his abduction and beating without being harmed.

On appeal, the BIA affirmed. It concluded that the harm Blanco experienced was "more akin to harassment" than persecution. App. 7. The BIA also stated that Blanco had not established a well-founded fear of future persecution because he "ha[d] not shown that there is even a 10% chance that a person in his position, i.e., a mere supporter of the LIBRE

Party[,] who, nearly two years ago, participated in a few marches . . . w[ould] be persecuted upon his removal to Honduras." App. 7. As to the CAT claim, the BIA reiterated that Blanco "ha[d] not presented any evidence which specifically corroborate[d] his own claimed fear." App. 7. Blanco now petitions this Court to review the BIA's decision.

## II.   Jurisdiction and Standard of Review

The BIA had jurisdiction to review Blanco's appeal from the IJ's decision under 8 C.F.R. § 1003.1(b)(3). This Court has jurisdiction to review a final order of removal under 8 U.S.C. § 1252(a). Ordinarily, this Court reviews only the BIA's decision because it is the "final order[]" subject to appellate review. *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d Cir. 2009). But where, as here, the BIA "affirmed and partially reiterated" the IJ's determinations, we review both decisions. *Id.* If the BIA relied on only some of the grounds given for denying relief, we review only those grounds. *Id.*

"While we review for substantial evidence the [agency's] factual findings, we review [its] legal determinations de novo, including both pure questions of law and applications of law to undisputed facts." *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020) (internal quotation marks and citations omitted).

## III.   Analysis

### A.   Blanco's Asylum and Withholding of Removal Claims

To establish asylum eligibility, a noncitizen must show that he is a "refugee" within the meaning of the Immigration and Nationality Act. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A). A "refugee" is a person who is "unable or unwilling to return to" his home country because of past persecution or, in the

6

alternative, a well-founded fear of future persecution, on account of a protected ground—"race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). The noncitizen must also show that the government in his home country either committed the persecution or was unable or unwilling to control the persecutor. *Chen Yun Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002), *superseded on other grounds by* 8 U.S.C. § 1158(b)(1)(B)(iii).

A noncitizen who applies for asylum automatically applies for withholding of removal. 8 C.F.R. § 1208.3(b). The Attorney General must grant withholding of removal to a noncitizen who shows a "clear probability" that his "life or freedom would be threatened" in his home country because of a statutorily protected ground. 8 U.S.C. § 1231(b)(3)(A); *Toure v. Att'y Gen.*, 443 F.3d 310, 317 (3d Cir. 2006). A "clear probability" means that persecution is "more likely than not." *Toure*, 443 F.3d at 317 (internal quotation marks and citation omitted). This standard is higher than the asylum standard; thus, an alien who fails to establish asylum eligibility necessarily fails to demonstrate a "clear probability" of persecution, as required for withholding of removal. *Id.*

Blanco argues that the BIA and IJ erred in concluding that he did not establish past persecution or a well-founded fear of future persecution to support his asylum and withholding of removal claims.[1] We agree.

---

[1] The BIA and IJ focused on the persecution element of asylum, concluding that because Blanco failed to establish that he suffered past persecution or a well-founded fear of future persecution, he was not eligible for asylum. In terms of the second element—that the persecution is on account of one of

### 1. Past Persecution

To show that he is eligible for asylum because of past persecution, Blanco must demonstrate that what happened to him "rise[s] to the level of persecution." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003) (quoting *Chen Yun Gao*, 299 F.3d at 272). "[P]ersecution does not encompass all forms of unfair, unjust, or even unlawful treatment." *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006) (internal citation omitted). "Rather, we have defined persecution as including 'threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom.'" *Lukwago v. Ashcroft*, 329 F.3d 157, 168 (3d Cir. 2003) (quoting *Lin v. I.N.S.*, 238 F.3d 239, 244 (3d Cir. 2001)).

To determine whether an experience rises to the level of persecution, we must look at its "cumulative effect[,] . . . because taking isolated incidents out of context may be misleading." *Herrera-Reyes*, 952 F.3d at 106 (citation and alternations omitted). Persecution may be "actual or threatened." *Id.* "Even if one incident of mistreatment is not, in and of itself, severe enough to constitute persecution, a series of incidents of physical or economic mistreatment could, taken together, be sufficiently abusive to amount to persecution." *Fei Mei Cheng v. Att'y Gen.*, 623 F.3d 175, 193 (3d Cir. 2010).

In this case, Blanco's past harm includes the November 2017 abduction and beating and the series of death threats that

the statutorily protected grounds—the IJ stated that "this event may have been on account of his political opinion," App. 46, and the BIA did not address the subject. Neither the IJ nor the BIA addressed the third element—whether the government in Honduras committed the persecution or was unable or unwilling to control the persecutor.

followed. The BIA and IJ misstated our precedent in three ways when determining whether this harm rose to the level of persecution: first, by requiring Blanco to show severe physical harm in order to establish past persecution; second, by requiring the death threats to be imminent; and third, by considering the beating and death threats separately.

### a. The Injury Did Not Need to be Severe

This Court does not "condition[] a finding of past persecution on whether the victim required medical attention . . . or even on whether the victim was physically harmed at all." *Doe v. Att'y Gen.*, 956 F.3d 135, 145 (3d Cir. 2020). "We have never reduced our persecution analysis to a checklist or suggested that physical violence—or any other single type of mistreatment—is a required element of the past persecution determination." *Herrera-Reyes*, 952 F.3d at 110. Nor do we "measure[]" the "severity of an injury" in "stitches." *Kibinda v. Att'y Gen.*, 477 F.3d 113, 120 (3d. Cir. 2007). However, that is exactly what the BIA and IJ did here. The IJ stated that "[a]lthough [Blanco] was mistreated, . . . the beating was not severe and not did end with any serious physical injuries." App. 46. The BIA agreed, noting that Blanco "required only Tylenol" to treat his physical injuries, "as opposed to stitches, surgery, or prescription medication." App. 6.

The IJ relied on our prior holding that "an isolated incident that does not result in serious injury does not rise to the level of persecution." App. 32 (citing *Voci v. Gonzales*, 409 F.3d 607, 615 (3d Cir. 2005)). However, setting aside the fact that Blanco's abduction and beating was not an isolated incident (it was followed by four death threats), we have never defined serious injury to mean serious *physical* injury. *See, e.g.*, *Doe*, 956 F.3d at 145.

For example, in *Chavarria v. Gonzalez*, we held that death threats that "cause significant actual suffering or harm" are cognizable forms of persecution. 446 F.3d at 518, 520 (internal quotation marks omitted). When Chavarria saw paramilitary forces attacking two members of a humanitarian organization that opposed the Guatemalan government, he came to their aid. *Id.* at 513. Soon after, his home was surveilled by the paramilitary forces. *Id.* Some time later, while driving at night, Chavarria was stopped, forced from his car, and robbed by individuals who pointed a gun to his head and warned him that "if we ever see you again, you're not going to even live to tell the story." *Id.* Chavarria's request for asylum was denied. *Id*. at 515. The BIA concluded that he "failed to demonstrate past persecution, because there was never any specific threat of harm rising to the level of past persecution or any physical harm." *Id*. We reversed, concluding that even though there was no evidence of physical harm, Chavarria's death threat, in light of his experience of being forced from his car and robbed at gunpoint, rose to the level of persecution. *Id*. at 520.

The Government attempts to distinguish *Chavarria* by saying that the threats to Blanco were "indirect . . . (via letter and telephone)" and that Blanco had "no bruises or cuts . . . [or] broken bones." Resp't's Br. 19. However, *Chavarria* did not hold that threats must be made "directly" or in person to constitute persecution. Furthermore, like Blanco, Chavarria did not sustain bruises, cuts, or broken bones. In fact, he was not *physically* harmed at all, whereas Blanco was beaten—for hours.

The Government argues that this case is more similar to *Kibinda*, where this Court held that petitioner's five-day detention by the Angolan army and subsequent maltreatment—having an object thrown at him so that he needed seven

10

stitches—was "far from unusual or extreme" and did not constitute past persecution. 477 F.3d at 117, 119. However, evaluating past persecution is not as simple as comparing the severity of each injury. Kibinda had provided no other objective evidence to demonstrate that the single injury was enough to constitute persecution. *Id.* at 119. Furthermore, we have since clarified that *Kibinda* did not "foreclose[] the possibility that outrageous conduct, even if limited to a single event without physical harm, could rise to the level of persecution, as was the case in *Chavarria*." *Doe*, 956 F.3d at 145 n.5.

Thus, our precedent demonstrates that physical harm is not dispositive in establishing past persecution. The BIA and IJ erred in requiring that Blanco show physical harm, much less severe physical harm.

      b.   <u>Threats Need Not Be "Imminent," But Rather "Concrete" and "Menacing"</u>

The BIA and IJ next erred by requiring that the threats Blanco received be "imminent," in addition to "concrete and menacing." This is not our standard for assessing whether threats are sufficiently serious to constitute persecution. We explained this point at some length in *Herrera-Reyes*. We noted that it is true that "we have sometimes used the phrase 'highly imminent, concrete *and* menacing.'" 952 F.3d at 108 (quoting *Chavarria*, 446 F.3d at 520 (emphasis added)). "[M]ore frequently," however, "we have used the terms 'concrete' and 'imminent' interchangeably or in the disjunctive." *Id.* That, we explained, "is with good reason: 'Imminence' is a misnomer here." *Id.* In actuality, "[w]e have neither required that the threat portend immediate harm nor that it be in close temporal proximity to other acts of

11

mistreatment." *Id.* The key is not a threat's imminence, but rather its likelihood, which is "subsumed in the inquiry as to whether the threat is 'concrete.'" *Id.* For these reasons, we announced that we will "refer to the standard going forward simply as 'concrete and menacing.'" *Id.*[2]

"A threat is 'concrete' when it is not abstract or ideal, . . . but is corroborated by credible evidence." *Id.* (internal quotation marks and citations omitted). "[A] threat is 'menacing' where it show[s] . . . intention to inflict harm." *Id.* (internal quotation marks omitted). In sum, "a threat that is 'concrete and menacing' is simply one that—considered in the context of the full record—poses a severe affront to the petitioner's life or freedom." *Id.* (internal quotation marks omitted).

Both the BIA and the IJ repeatedly emphasized that, despite the death threats, Blanco remained unharmed in Honduras for over a year. As is clear, however, a threat need not be acted on to constitute persecution. *Herrera-Reyes*, 952 F.3d at 108. In a similar case to this one, where the threats were unfulfilled and the petitioner fled his home country, we wrote that "[t]o expect [a p]etitioner to remain idle in that situation—waiting to see if his would-be executioners would go through with their threats—before he could qualify as a refugee would upend the fundamental humanitarian concerns of asylum law." *Doe*, 956 F.3d at 144 (internal quotation marks and citation omitted). Indeed, if Blanco's persecutors had followed through

---

[2] While *Herrera-Reyes* was not published when the IJ and BIA issued their decisions, we made clear there that we were not establishing a new rule, but rather clarifying the standard that our precedent has always required. 952 F.3d at 108.

with their threats—as the BIA and IJ seem to suggest was necessary—Blanco would be dead.

The threats Blanco received were both concrete and menacing. Others who attended the LIBRE Party march had been killed—and some of those victims had received threatening letters like Blanco's beforehand. This demonstrates the "likelihood of the harm threatened." *See Herrera-Reyes*, 952 F.3d at 108. Furthermore, the threats were concrete because, as Blanco credibly testified, during the fourteen months after the November 2017 incident, he fled from city to city as the police continued to look for him. The threats were also "menacing" because they expressed the intention to kill Blanco and his family if he did not leave Honduras.

Thus, the BIA and IJ erred by not applying the proper standard under our precedent in evaluating when threats suffice to establish persecution.

c.  Harm Must Be Considered Cumulatively

Lastly, the BIA and IJ erred by failing to consider the aggregate effect of Blanco's mistreatment. *See Herrera-Reyes*, 952 F.3d at 109. In determining whether an asylum applicant suffered past persecution, the agency may not "take a single instance of mistreatment . . . from a larger pattern of abuse and confine its persecution analysis to the question of whether that single instance was, in and of itself, persecutory. Instead, incidents alleged to constitute persecution . . . must be considered cumulatively." *Fei Mei Cheng*, 623 F.3d at 192 (internal quotation marks, alteration, and citation omitted). "Even if one incident of mistreatment is not, in and of itself, severe enough to constitute persecution, a series of incidents . . . could, taken together, be sufficiently abusive to amount to persecution." *Id.* at 193. Thus, each incident must be "assessed

13

within the 'overall trajectory of the harassment.'" *Id.* at 193 (quoting *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 343 (3d Cir. 2008)).

Moreover, "[a] cursory invocation of the word 'cumulative' is insufficient": "[e]ven if the [agency is] correct that no single incident in isolation rose to the level of past persecution, [it is] still required to analyze whether the cumulative effect of these incidents constituted a severe 'threat to life or freedom.'" *Herrera-Reyes*, 952 F.3d at 109 (quoting *Fei Mei Cheng*, 623 F.3d at 192–93). In *Herrera-Reyes*, for example, the IJ erred "[b]y finding it dispositive that [the p]etitioner herself 'was never physically harmed' . . . and by failing to factor in the cumulative effect of the destruction of [her] home, the shooting of her convoy, the murder of her political compatriot, the armed robbery of the inauguration preparations, and the verbal death threat." *Id.*

There appears to have been a difference between what the BIA did and what it said it was doing when it analyzed the cumulative effect of Blanco's experience. It "paid lip service" to the notion of cumulative analysis, *id.* at 110, stating that it was looking at "the past harm, considered cumulatively." App. 6–7. But it also said the harm was "more akin to harassment," emphasizing that the events "commenced with an *isolated incident* of physical harm." App. 7 (emphasis added). The BIA and IJ did not consider how the "surrounding acts of mistreatment" (the abduction and beating by the Honduran police and Blanco's testimony regarding other LIBRE Party protesters who had been killed) "corroborated" the death threats that Blanco received. *See Herrera-Reyes*, 952 F.3d at 110. Thus, as in *Herrera-Reyes*, "although [the agency] purported to consider the incidents 'cumulatively,' in practice [it] evaluated the [harm] to [Blanco] in isolation and without accounting for the broader campaign of intimidation,

14

harassment, and violence substantiated by the record." *Id.* at 108 (internal citations omitted).

Although *Herrera-Reyes* is factually different from Blanco's case, at bottom it addressed "whether and under what circumstances threats of violence may contribute to a cumulative pattern of past persecution when not coupled with physical harm to the asylum-seeker or her family." *Id.* at 104. To this effect, we noted that "[i]n evaluating whether a threat is 'concrete and menacing' in the absence of physical harm . . . ., we have considered more broadly whether surrounding acts of mistreatment had corroborated that threat with the ultimate effect of placing the petitioner's life or liberty in peril." *Id.* at 110.

In *Herrera-Reyes*, we concluded that the incidents the petitioner experienced "reflect[ed] an escalating pattern of mistreatment" that culminated in a final death threat, and that final death threat was "concrete and menacing" considering the context in which it was given. *Id*. at 111–12. That context was the fact that the petitioner was the leader and president of an opposition group to the Nicaraguan government who experienced verbal threats, the burning of her family's home, the murder of her close compatriot, and the robbery of her workspace at gunpoint. *Id*. at 104, 112.

The four death threats lodged against Blanco were, of course, not received in an identical context. The most important differences are that Blanco was not a high-level leader of the LIBRE Party and the record does not reflect that he was a close associate of the members of the LIBRE Party who were killed—though he did learn that some were killed after receiving similar threatening letters. Nevertheless, the incidents Blanco experienced "reflect an escalating pattern of mistreatment," *id*. at 112, sufficient to rise to the level of

persecution because Blanco, unlike Herrera-Reyes, suffered physical harm—the November 2017 abduction and beating—in addition to receiving threats of violence. Furthermore, unlike Herrera-Reyes, the death threats Blanco received were also directed towards Blanco's family.

Ultimately, while *Herrera-Reyes* is instructive to our analysis, we must remember that it addressed "under what circumstances threats of violence may contribute to a cumulative pattern of past persecution when not coupled with physical harm." *Id.* at 104. Thus, the factual differences between Herrera-Reyes's case and Blanco's case become less significant when one considers that Blanco's threats of violence—that contributed to a cumulative pattern of past persecution—*were* coupled with physical harm. We think it is appropriate to conclude that it was more important to Herrera-Reyes's past persecution analysis that she was a leader of her political movement and that she was close associates with the political activist who was murdered because Herrera-Reyes could not show any physical harm. But here, Blanco's threats of violence were coupled with physical harm, and that suffices to establish past persecution in this case.

\* \* \*

In sum, the BIA and IJ erred when they held that the harm Blanco experienced did not meet our legal standard for past persecution. Upon application of the proper standard, it is clear from the record that Blanco has established past persecution. We will remand to the BIA to consider the other two elements of asylum eligibility, that is, whether the persecution was on account of a statutorily protected ground and whether it was committed by the government or forces the government was unable or unwilling to control.

### 2. Well-founded Fear of Future Persecution

A noncitizen who proves past persecution is "presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 1208.13(b)(1). The burden then shifts to the Government to rebut this presumption, and it can do so by showing that there has been a "fundamental change in circumstances" or that the noncitizen "could avoid future persecution by relocating" to another part of his or her home country and "it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(1)(i)(A), (B), (ii).

Because Blanco was subjected to past persecution, he was entitled to a rebuttable presumption of a well-founded fear of future persecution. "But as the IJ erroneously found to the contrary and the BIA affirmed, neither determined whether the presumption of future persecution could be rebutted, and that determination lies with the agency in the first instance." *Herrera-Reyes*, 952 F.3d at 112 (citing 8 C.F.R. § 1208.13(b)(1)(i)).

### 3. Withholding of Removal

"To qualify for withholding of removal, an alien must establish a 'clear probability of persecution,' i.e., that it is more likely than not, that s/he would suffer persecution upon returning home." *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011). "Since this standard is more demanding than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding of removal." *Id.* (citation omitted). The IJ and the BIA concluded that Blanco had not established eligibility for asylum because he failed to demonstrate past persecution or a well-founded fear of future persecution, so they summarily dismissed Blanco's claim for withholding of removal.

17

Because we conclude that Blanco has established past persecution, we will vacate the BIA's denial of withholding and remand with instructions to reconsider the claim. *See Konan v. Att'y Gen.*, 432 F.3d 497, 501 (3d Cir. 2005) (explaining that our review of the BIA's decision "is limited to the rationale that the agency provides").

B.  Blanco's CAT Claim

To establish eligibility for a mandatory grant of withholding or deferral of removal under the CAT, an applicant must prove "that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Torture is:

> (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

*Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005). "The objective evidence to be considered in evaluating a CAT claim includes '[e]vidence of past torture inflicted upon the applicant;' '[e]vidence of gross, flagrant or mass violations of human rights within the country of removal;' and '[o]ther relevant information regarding conditions in the country of removal.'" *Id.* at 134 (quoting 8 C.F.R. § 1208.16(c)(3)).

The applicant bears the burden of proving his entitlement to protection under the CAT, and his testimony "if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2). "However, corroborating evidence may be required when it is reasonable

18

to expect it, such as for 'facts [that] are central' to a claim and easily verified." *Luziga v. Att'y Gen.*, 937 F.3d 244, 255 (3d Cir. 2019) (quoting *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 (3d Cir. 2007)).

"Before requiring corroborating evidence, i.e., deciding that 'failure to corroborate undermines' a claim, an IJ must follow the *Abdulai* inquiry." *Id.* (quoting *Saravia v. Att'y Gen.*, 905 F.3d 729, 736 (3d Cir. 2018)). That three-part inquiry requires that an IJ (1) identify "the facts for which 'it is reasonable to expect corroboration,'" (2) ask whether the applicant has corroborated them, and (3) if not, consider "whether the applicant has adequately explained his . . . failure to do so." *Id.* (quoting *Saravia*, 905 F.3d at 736). "We have repeatedly held that the [BIA's or IJ's] failure to engage in the three-part inquiry described above requires that the BIA's findings regarding corroboration be vacated and remanded." *Toure*, 443 F.3d at 323; *see also Luziga*, 937 F.3d at 255; *Mulanga v. Ashcroft*, 349 F.3d 123, 136 (3d Cir. 2003).

Here, the IJ did not engage in the three-part *Abdulai* inquiry before denying Blanco's CAT claim on the basis that "there is nothing in the Country Reports to corroborate" Blanco's belief that his name is on a government list of opposition members and he has "not provided any corroborating evidence." App. 47. The BIA affirmed on the same basis. This was legal error. Therefore, we will vacate and remand for the BIA to apply the correct legal standard in the first instance.[3]

---

[3] On remand, there is also a question regarding the reasonableness of the demand for corroboration:

> It is obvious that one who escapes persecution in his or her own land will

## IV. Conclusion

For these reasons, we will grant the petition for review of Blanco's asylum, withholding of removal, and CAT claims, vacate the BIA's order, and remand for further proceedings consistent with this opinion. Because we conclude that Blanco has established past persecution, on remand, the BIA should consider the remaining elements of asylum eligibility (whether the persecution was on account of a statutorily protected ground and whether it was committed by the government or forces the government was unable or unwilling to control) and whether he was entitled to withholding of removal. In addition, the BIA should reevaluate whether Blanco was entitled to relief under the CAT

---

rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum. It is equally obvious that one who flees torture at home will rarely have the foresight or means to do so in a manner that will enhance the chance of prevailing in a subsequent court battle in a foreign land. Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution.

*Toure*, 443 F.3d at 324 (quoting *Senathirajah v. I.N.S.*, 157 F.3d 210, 215–16 (3d Cir. 1998)). The agency should take these principles into account when performing the *Abdulai* inquiry.