**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1209
_____

JUAN RAMON ABREU,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a Final Order of the
Board of Immigration Appeals
No. A077-030-517
Immigration Judge: Jason L. Pope
_____

Argued on July 13, 2023

Before: PHIPPS, McKEE, and RENDELL, *Circuit Judges*

(Opinion filed: January 18, 2024)

Christopher R. Healy **[Argued]**
Kaitlin L. O'Donnell
Troutman Pepper
Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
        *Counsel for Petitioner*

Brian M. Boynton
Holly M. Smith
Anne Donohue **[Argued]**
Stefanie N. Hennes
David Schor
Christin M. Whitacre
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

_____

OPINION[*]

_____

McKEE, *Circuit Judge*

Juan Ramon Abreu seeks review of the Board of Immigration Appeals' denial of his application for deferral of removal under the Convention Against Torture.[1] An Immigration Judge denied Abreu's application because he found the likelihood that Abreu would be tortured to be "speculative" and because he found that local police in the Dominican Republic would make efforts to protect Abreu from torture. The BIA affirmed on both bases. However, the IJ and BIA failed to consider evidence of explicit death threats received by Abreu and also failed to explain how the evidence supports their conclusion that local police would protect Abreu. Because of these errors, we will grant Abreu's petition for review and remand for further proceedings.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
[1] We have jurisdiction to review the BIA's order under 8 U.S.C. § 1252(a)(1).

# I.

Where the BIA affirms and partially reiterates the IJ's conclusions, we review both the BIA's and the IJ's opinions.[2] We review legal determinations de novo and factual findings for substantial evidence.[3] In the immigration context, we set aside the agency's findings only if a "reasonable adjudicator would be compelled to conclude to the contrary" after reviewing the record as a whole.[4]

To obtain deferral of removal under the Convention Against Torture, an applicant must prove that it is "more likely than not that he or she would be tortured if removed."[5] An act constitutes "torture" only if it is inflicted "by, or at the instigation of, or with the consent or acquiescence of" the government of the country to which the applicant will be removed.[6]

The IJ concluded that Abreu's fear of future torture was too "speculative."[7] The IJ reasoned that a substantial amount of time had transpired since Abreu's family members were threatened or assaulted in the Dominican Republic. The IJ also reasoned that there was insufficient evidence connecting the anonymous threats Abreu received and the assaults he suffered in 2018 to the persecutors whom Abreu fears. And while the IJ noted that individuals in the Dominican Republic had communicated threats against Abreu to

---

[2] *Saban-Cach v. Att'y Gen.*, 58 F.4th 716, 724 n.23 (2023) (quoting *Blanco v. Att'y Gen.*, 967 F.3d 304, 310 (3d Cir. 2020)).
[3] *Id.*
[4] *Alexander-Mendoza v. Att'y Gen.*, 55 F.4th 197, 207 (3d Cir. 2022) (quotation omitted).
[5] 8 C.F.R. § 1208.16(c)(2).
[6] 8 C.F.R. § 1208.18(a)(1).
[7] A.R. 86.

Abreu's friend, Espinar, the IJ reasoned that these threats were merely "veiled" and "speculative."[8] The BIA affirmed these findings.

The fundamental problem with the IJ's and BIA's conclusions, however, is that the IJ appears to have failed to consider evidence that Abreu received explicit death threats from Tito in 2018. In his affidavit, Abreu averred that Tito sent him text messages "warning . . . that if [Abreu] ever return[ed] to the Dominican Republic [he would] be killed."[9] Abreu also submitted an affidavit from Espinar in which Espinar averred that he (Espinar) had encountered Tito in the Dominican Republic, that Tito had said he was "going to kill [Abreu]," and that Tito had shown Espinar a gun while declaring that he would use that specific gun to kill Abreu.[10] On their face, these two affidavits reflect specific and serious threats to Abreu's life. But neither the BIA's nor IJ's opinion discusses either Tito's text messages or his interaction with Espinar. In fact, neither opinion even mentions Tito.

The BIA seems to have believed that the IJ at least reviewed Espinar's affidavit, noting that the IJ considered "the letter provided by the respondent's friend from the Dominican Republic."[11] But we see no support for that belief in the IJ's opinion. The IJ's opinion refers generally to "statements regarding the conversations that [Espinar] had with people within the Dominican Republic" that involved "veiled" and "speculative

---

[8] A.R. 87.
[9] A.R. 247.
[10] A.R. 354.
[11] A.R. 4.

threats" against Abreu.[12] But this portion of the IJ's opinion cannot refer to the threat reflected in Espinar's affidavit because that threat was neither "veiled" nor "speculative." There is nothing "veiled" about threatening to kill someone while brandishing the gun that will be used to commit the killing. And Tito's promise to kill Abreu—which he made while demonstrating that he had the means and motive to follow through—left little to speculation.

Perhaps the IJ and BIA believed that the evidence of Tito's explicit threats should not be credited or should be disregarded for some other reason. But if that is the case, then the IJ and BIA must explain why.[13] Absent such an explanation, we can assume only that the IJ simply ignored this evidence, which precludes us from finding that the IJ's and the BIA's factual findings are supported by substantial evidence.[14]

The government nevertheless argues that we should affirm even though the IJ failed to consider evidence of Tito's explicit threats because the BIA also held that government officials would not acquiesce in Abreu's torture. We disagree for at least two reasons.[15]

---

[12] A.R. 87.
[13] *Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019) (explaining that the IJ and BIA may not ignore evidence, and "if evidence is to be disregarded, we need to know why" (brackets omitted)) (quoting *Myrie v. Att'y Gen.*, 855 F.3d 509 (3d Cir. 2017)).
[14] *Id.* ("[T]he agency 'may not ignore evidence favorable to the alien'") (quoting *Huang v. Att'y Gen.*, 620 F.3d 372 (3d Cir. 2010)).
[15] Judge Phipps does not join the analysis as to the second acquiescence rationale.

5

First, because the IJ and BIA failed to consider whether Tito was likely to attempt to torture Abreu, they necessarily failed to consider how the Dominican government would respond if Tito *were* to attempt to torture or kill Abreu.

Second, to the extent the IJ and BIA concluded that the local authorities would protect Abreu from the persecutors he fears—Tito or otherwise—this conclusion is unsupported by substantial evidence, at least as it is presented in the IJ's and BIA's opinions.

The IJ concluded that local authorities would not turn a blind eye to Abreu's torture because local police were "receptive" to Abreu's family's complaints in 2008, "investigated" those complaints, and protected Abreu's family *for a fee*.[16] However, there is no evidence that the police did anything to investigate the threats Abreu's family received in 2008. The only record evidence that could potentially reflect investigative efforts is the police report summarizing the threats. But it appears that this police report was prepared only after Abreu's daughter asked the police for an update on the case in 2018—ten years after the threats were made. The only other evidence of a police response is that the police assigned personnel to protect Abreu's family for one week after the threats were made. But this protection had to be paid for, as both the IJ and BIA noted. A payment to secure protection from the police seems like a bribe. If this payment

---

[16] A.R. 87.

was a bribe, then, as a matter of law, the protection it purchased cannot support the IJ's and BIA's finding that the authorities would be willing to protect Abreu.[17]

The Government argues that the price Abreu's brother paid the police for protection was not a bribe but a fee for *additional* services that go beyond the ordinary duties of the Dominican police. But since it appears that the police did nothing else in 2008 in response to Abreu's family's complaint, the Government's interpretation of the fee-for-protection arrangement is difficult to accept. Further, Abreu has credibly testified that he cannot afford to pay for protection in any event. It is therefore difficult to see how the availability of protection for a fee would support a finding that the local police would protect Abreu.

There may be other reasons to believe the police would attempt to protect Abreu from torture or a fatal assault. Absent further explanation by the IJ and BIA, however, we cannot find that the BIA's conclusion that the local police would protect Abreu is supported by substantial evidence.[18]

---

[17] *Cf. Bosede v. Mukasey*, 512 F.3d 946, 951 (7th Cir. 2008) ("We have said before and underscore here that whether an alien might succeed in escaping persecution or torture through bribery is an irrational and altogether improper consideration in deciding a claim for asylum or other relief.") (first citing *Oyekunle v. Gonzales*, 498 F.3d 715, 717 (7th Cir. 2007) and then citing *Giday v. Gonzales*, 434 F.3d 543, 555 (7th Cir. 2006)).
[18] *See Kang v. Att'y Gen.*, 611 F.3d 157, 167 (3d Cir. 2010) ("[B]ecause the BIA ignored overwhelming probative evidence produced . . . its findings were not reasonably grounded in the record and thus we accord no deference to the BIA's decision . . . we find that the BIA's determination was not based on substantial evidence.").

**III.**

For these reasons, we will grant the petition for review and remand for further proceedings consistent with this opinion.