**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3338
_____

CHUKWUDI GABRIEL OLEKA,

                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
(A209-355-331)
Immigration Judge: Kuyomars "Q" Golparvar
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
October 27, 2023

Before:  HARDIMAN, FREEMAN, and MONTGOMERY-REEVES, *Circuit Judges*.

(Opinion filed: February 15, 2024)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

MONTGOMERY-REEVES, *Circuit Judge*.

Chukwudi Gabriel Oleka petitions this Court for review of a final order of removal issued by the Board of Immigration Appeals (the "BIA"). The order affirmed the Immigration Judge's (the "IJ") denial of Oleka's applications for asylum, withholding of removal, and protection under the Convention Against Torture.

On appeal, Oleka argues that the IJ violated his due process rights by unduly restricting the removal hearing such that Oleka was unable to make arguments on his behalf, improperly relying on findings from a separate bond proceeding as well as impeachment evidence that Oleka was unable to review, and refusing to sign a subpoena for discovery from the criminal case. Oleka also argues that the BIA committed reversible error by requiring that he show substantial prejudice to establish his due process claim. As discussed below, Oleka has failed to show that the IJ violated his due process rights. Therefore, we will deny his petition.

## I.    BACKGROUND

Oleka is a native of Nigeria. On April 8, 2016, Oleka, accompanied by his wife and daughter, entered the United States on a non-immigrant visa after receiving threats of violence against their family. Oleka believed that these threats were orchestrated by the Islamist militant organization Boko Haram, which caused Oleka to fear for his own safety and that of his family. To facilitate his family's entry into the United States, Oleka authorized his sister to hire a travel agent on his behalf to assist him and his family with their visa applications to the United States. At some point, Oleka learned that the travel

2

agent provided false information about Oleka's employment in Nigeria and his reasons for traveling to the United States in his visa application.

Before his visa expired on October 7, 2016, Oleka hired an attorney to help him seek asylum. According to Oleka, the attorney encouraged him to "have someone 'make' a letter for [him]" to obtain evidence to support his asylum application—even after Oleka told him that there was none. A.R. 574. Among other things, the attorney instructed Oleka to write a statement saying that his father was "killed by [Boko Haram]" even though Oleka knew this was not true. A.R. 989. Oleka also admits to "obtain[ing] several pieces of doctored letters and other informal documents and submitt[ing] them" in support of his asylum application. Oleka Br. 12.

In August 2020, Oleka was arrested and charged with three crimes—each of which related to allegations by his wife that he had sexually abused their daughter. The prosecution later dropped two of the three charges and amended the third to Endangering the Welfare of a Child. Immediately following Oleka's release from State custody, he was detained by Immigration and Customs Enforcement, and the Department of Homeland Security ("DHS") began removal proceedings against him.

On May 17, 2022, the IJ held a hearing on Oleka's removal. While reviewing the record, the IJ initially marked into evidence his earlier memorandum opinion denying Oleka's request for bond because Oleka had failed to demonstrate that he was not a danger to the community (the "Bond Memo"). Oleka's counsel objected and argued that the evidence and findings in the removal proceeding should be considered separately from the evidence and findings in the bond proceeding. After hearing from DHS, the IJ

3

determined that the Bond Memo would be marked for identification purposes only. Oleka's counsel requested additional assurance that the IJ would not rely on the Bond Memo in the removal proceeding, to which the IJ responded, "[a]bsolutely." A.R. 159–60.

Oleka's counsel also requested that the IJ subpoena photographs from Oleka's criminal case depicting the injuries that Oleka's daughter sustained from the alleged sexual abuse. DHS opposed Oleka's request on the ground that there was enough alternative evidence to determine whether Oleka had sexually abused his daughter and that the IJ should not allow Oleka to relitigate his criminal case in an immigration proceeding. The IJ denied Oleka's request for a subpoena.

Next, the IJ addressed witness and examination issues. The IJ asked Oleka's counsel how much time she needed for direct examination, and she anticipated one hour. The IJ gave counsel the full hour but asked that she try to finish in 45 minutes. During direct examination, Oleka's counsel began asking questions about Oleka's asylum application and the attorney who helped him prepare it. The IJ interrupted this line of questioning and asked about its relevance. Counsel responded, "I'm laying a foundation for the withdrawal of documents and both the unlawful and ineffective advice given by his attorney around that." App. 206. The IJ reminded counsel that he had granted her motion to withdraw the documents and even though the Government stated that it may reintroduce the documents on cross-examination, the documents were not currently part of the record. *Id.* Counsel responded, "[o]kay, thank you, [Y]our [H]onor. Then we won't ask questions about that right now." *Id.* She then moved on. At the 45-minute

mark, the IJ informed Oleka's counsel that she should try to finish in the next 15 minutes. After exceeding the one hour, the IJ informed counsel that she had "10 more minutes" to conclude direct examination. A.R. 215. Oleka's counsel then requested another 20 minutes and proposed that the time allocated for a different witness be reallocated to Oleka's direct examination. Although the IJ seemed like he would potentially grant the request, he ultimately denied it after Oleka's counsel continued to object to the IJ's "limit[ing] [Oleka']s testimony." App. 217. He then reiterated that Oleka's counsel had "until 3:05[,]" to wrap up. *Id.*

During cross-examination, DHS inquired into the false information Oleka submitted in his visa and asylum applications. Oleka's counsel objected on hearsay grounds, and the IJ overruled the objection. On redirect, Oleka's counsel asked questions about Oleka's asylum application and the attorney who helped him prepare it. Around 4:00 p.m., the IJ informed the parties that because of the time restraints placed on Oleka, as an ICE detainee, and the fact that several witnesses remained, the hearing would be continued to May 31 at 1:30 p.m. None of the parties objected.

On May 25, Oleka's counsel moved to reopen direct examination, arguing that the time limitations imposed by the IJ were unreasonable and violated Oleka's due process rights. Counsel's motion provided eight bullet points listing the topics Oleka wished to address. The topics focused on evidence that the sexual assault allegations against him were false, details of his arrest, Oleka's positive work history and religious activities while in the United States, and "all subjects relevant to discretion[.]" A.R. 366–67.

5

The immigration hearing resumed on May 31. At the close of witness testimony, the IJ considered Oleka's motion to reopen. Oleka's counsel requested 30 minutes to conduct direct examination, and DHS did not oppose this motion. The IJ confirmed that Oleka sought to testify further on the "discretionary component" of Oleka's requests for relief—including the IJ's credibility determination. A.R. 337. The IJ determined that reopening the record for 30 minutes of live testimony seemed like "a lot" because (1) counsel had received an hour and a half to conduct Oleka's direct examination, (2) the record contained a "detailed statement" from Oleka, and (3) Oleka presented "many witnesses" who testified about the discretion issue. A.R. 338. Rather than allowing live testimony, the IJ permitted Oleka to submit a three-page statement addressing any discretionary issues that he believed were not adequately covered during the hearing. The IJ also instructed the parties to submit written closing statements. None of the parties objected to the IJ's instructions. Oleka then submitted a seven-page declaration addressing his life in the United States, the allegedly false accusations that led to his arrest, and his submission of false information in his visa and asylum applications.

After considering the evidence and the parties' submissions, the IJ denied Oleka's requests for relief. The IJ determined that Oleka was not a credible witness because of the "[n]umerous discrepancies" in his visa and asylum applications, "unpersuasive" explanations for the false contents in these documents, admission that he submitted false information, failure to acknowledge "any wrongdoing[,]" and evasive demeanor and vague testimony about the falsities in his visa and asylum applications. App. 25–26. Thus, the IJ discounted Oleka's testimony. The IJ then determined that there was no

6

"independent evidence to corroborate any of [Oleka's] activities in Nigeria" and thus no evidence supporting Oleka's requests for relief. App. 29.

Oleka appealed the IJ's decision. The BIA affirmed the IJ's decision and adopted the IJ's reasoning. The BIA also held that Oleka failed to show that the IJ's adverse credibility finding was clearly erroneous or that he suffered substantial prejudice from the IJ's purported due process violations during the removal hearing. Oleka timely appealed.

## II.    ANALYSIS[1]

On appeal, Oleka argues that the IJ violated his due process rights by (1) marking the Bond Memo for identification purposes only, (2) denying Oleka's request to subpoena photographs from the child-endangerment case to support his claim that he did not sexually abuse his daughter, (3) imposing unreasonable restrictions on the time and scope of Oleka's direct examination and denying his motion to reopen direct examination, and (4) relying on DHS's impeachment evidence to find that Oleka's testimony was not credible.[2] For the reasons below, we hold that the IJ did not violate Oleka's due process rights.

---

[1] The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction under 8 U.S.C. § 1252. Generally, our jurisdiction is limited to final orders issued by the BIA. When, however, the BIA adopts the reasoning of an IJ, we also review the IJ's decision. *Blanco v. Att'y Gen.*, 967 F.3d 304, 309–10 (3d Cir. 2020). "But we look to the IJ's opinion only where the BIA has substantially relied on that opinion." *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543 (3d Cir. 2018) (cleaned up).

[2] The Government argues that Oleka has waived (or forfeited) any argument on the merits of the IJ's denial of his requests for removal relief. Because Oleka only asserts that the alleged due process violations entitle him to a new hearing, we do not address the merits of his removal petition. *In re: Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) ("As a general matter, an appellant [forfeits] an argument in support

We review due process claims de novo. *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 213 (3d Cir. 2017). "The Fifth Amendment protects the liberty of all persons within our borders, including aliens in immigration proceedings who are entitled to due process of law—that is, a meaningful opportunity to be heard—before being deported." *Id.* at 211. "This guarantee comprises three key protections: (1) factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) the opportunity to make arguments on his or her own behalf; and (3) an individualized determination of his [or her] interests." *Id.* at 213 (alteration in original) (cleaned up). In the context of removal proceedings, "[a] petitioner claiming a procedural due process violation because he was not afforded the opportunity to argue on his own behalf is required to show '(1) that he was prevented from reasonably presenting his case[,] and (2) that substantial prejudice resulted.'" *Id.* (alteration in original) (quoting *Fadiga v. Att'y Gen.*, 488 F.3d 142, 155 (3d Cir. 2007)). If, however, a due process claim turns on an agency's failure to comply with a regulation that it adopted to protect the "fundamental statutory or constitutional rights of parties appearing before it," a showing of substantial prejudice is not required. *See, e.g.*, *Freza v. Att'y Gen.*, 49 F.4th 293, 299 (3d Cir. 2022).[3]

---

of reversal if it is not raised in the opening brief.") (citing *McCray v. Fid. Nat'l Title Ins. Co.*, 682 F.2d 229, 241 (3d Cir. 2012)).

[3] Oleka argues that the BIA erred by requiring that he show substantial prejudice to establish his due process claim. Because we hold that the IJ did not violate Oleka's due process rights, we need not address this argument.

## A. Entry of the Bond Memo into the Evidentiary Record

Oleka argues that the IJ violated his due process rights by failing to make any de novo findings in the removal case related to the criminal charges against him, and introducing, sua sponte, the Bond Memo, which included findings related to the criminal charges.

Section 1003.19(d) of the Code of Federal Regulations ("CFR") provides that "[c]onsideration by the [IJ] of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding." 8 C.F.R. § 1003.19(d).

The record shows that when Oleka's counsel expressed concern over the marking of the Bond Memo for identification purposes, the IJ assured counsel that he would "[a]bsolutely" consider de novo the evidence supporting Oleka's innocence regarding his prior criminal charges, with no reliance on the findings from the Bond Memo. A.R. 159–60. Furthermore, the IJ's opinion does not mention the Bond Memo. And Oleka does not point to any findings of fact from the Bond Memo on which the IJ relied in ruling on Oleka's removal relief. To the contrary, all the facts about Oleka's arrest appear to come from Oleka's seven-page declaration. And the opinion mentions nothing about Oleka being a danger to the community. Rather, the opinion demonstrates that the IJ made an adverse credibility finding against Oleka based on his testimony and his "evasive" and "vague" responses when presented with questions about his prior misrepresentations. App. 26. The IJ explained that Oleka's responses on cross-examination showed a "failure [to] take responsibility . . . for the blatant misrepresentations made in his visa

9

application." *Id.* Thus, the IJ's reasoning shows that the IJ did not rely on the Bond Memo during the removal hearing. Accordingly, we conclude that the IJ did not violate Oleka's due process rights by marking the Bond Memo for identification.

**B.      Denial of Oleka's Motion for a Subpoena**

Oleka argues that the IJ violated his due process rights by refusing to issue a subpoena for photographic evidence related to his criminal case.

Section 1003.35 of the CFR provides that an immigration judge "shall" issue a subpoena, among other things, to produce documents if the IJ is satisfied that the evidence sought is "essential." 8 C.F.R. § 1003.35(b)(3). Evidence is considered "essential" if it is relevant or helpful to the factfinder in resolving a contested issue. *See, e.g.*, *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 273 (3d Cir. 2012) (concluding that documents regarding policies and procedures for conducting searches and seizures were essential to an alien's claim of "egregious or widespread . . . constitutional violations by the Government" in opposition to her removal).

To begin, Oleka's request for a subpoena was untimely. The IJ could have denied the request for a subpoena on this basis. But rather than do so, the IJ heard argument on the motion and determined that DHS's argument that there was enough alternative evidence to determine whether Oleka had sexually abused his daughter was more persuasive. In explaining why he found that Oleka lacked credibility, the IJ does not mention the criminal charges. Rather, the IJ gave a detailed recount of Oleka's "evasive" and "vague" responses to questions about his submission of false information. App. 26. Accordingly, Oleka has failed to show that any evidence to be acquired from the

10

subpoena was essential. Thus, he cannot show that the IJ violated his due process rights by denying Oleka's request for a subpoena.

## C. Limitations on Direct Examination and Denial of the Motion to Reopen

Oleka argues that the IJ imposed unreasonable restrictions on the time and scope of his direct examination. Oleka also argues that the IJ's denial of his motion to reopen precluded him from addressing the Government's impeachment evidence.

The INA gives immigration judges broad discretion in conducting proceedings. *Matter of Jesus Interiano-Rosa*, 25 I & N Dec. 264, 265 (BIA 2010). This discretion includes whether to admit evidence. *Id.* The applicable regulations also provide that immigration judges "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases." 8 C.F.R. § 1003.10(b). But an IJ who interferes with a litigant's right to present evidence on his own abuses that discretion and violates a litigant's due process rights. *See, e.g.*, *Serrano-Alberto*, 859 F.3d at 214, 224–25 (concluding that an IJ's "hostile and impatient attitude, repeated interruptions and castigations, constrictions on relevant responses, and inexplicable focus on irrelevant details" impaired the petitioner's ability to present facts that, facially, supported the requested relief); *see also Wang v. Att'y Gen.*, 423 F.3d 260, 269–71 (3d Cir. 2005) (concluding that an IJ's "disparag[ing]" and "sarcas[tic]" tone during the petitioner's removal hearing and consistent expression of disapproval regarding the petitioner's personal life violated the petitioner's due process rights).

11

Oleka's argument that the IJ unreasonably restricted the scope of Oleka's direct examination conflicts with the record. When the IJ interrupted and inquired into Oleka's counsel's line of questioning regarding the asylum application and assisting attorney, his counsel responded, "I'm laying a foundation for the withdrawal of documents and both the unlawful and ineffective advice given by his attorney around that." A.R. 206. When the IJ reminded counsel that he granted her motion to withdraw the documents and that she could address them if the Government reintroduced them, counsel stated, "[o]kay, thank you, [Y]our [H]onor. Then we won't ask questions about that right now." *Id.* And counsel did in fact address the withdrawn documents on redirect after DHS introduced them on cross-examination. Thus, the record does not show that the IJ unduly restricted the scope of direct examination.

Oleka also argues that during his direct examination, the IJ imposed unreasonable time restrictions. This argument also conflicts with the record. First, Oleka's counsel originally requested an hour for direct examination. The IJ asked counsel to try to complete direct examination in 45 minutes but hedged that counsel could have the full hour if needed. And while Oleka is correct that at the 45-minute mark, the IJ interrupted and alerted counsel of the time, the IJ ultimately provided counsel with an hour and a half to conduct direct examination. Second, Oleka's counsel had a chance to conduct redirect after DHS cross-examined Oleka. Third and finally, in response to the motion to reopen direct examination, the IJ provided Oleka another opportunity to establish facts by submitting a three-page declaration. And even though counsel exceeded the three-page limit by submitting a seven-page declaration, the detailed factual recitation in the IJ's

12

opinion shows that the IJ accepted and considered it. Therefore, we cannot conclude that the IJ's limitations on direct examination and his decision to allow submission of a declaration in response to the motion to reopen, rather than live testimony, violated Oleka's due process rights.[4]

### D.      The IJ's Reliance on the Impeachment Evidence

Oleka argues that the IJ violated his due process rights by (1) allowing DHS to reintroduce, on cross-examination, Oleka's visa and asylum applications, which Oleka's counsel previously admitted and withdrew, and (2) relying on this impeachment evidence to support his adverse credibility finding. Oleka asserts that these rulings violated his due process because Oleka "had no opportunity to review and explain" any discrepancies in his applications. Oleka Br. 32.

These arguments do not show that the IJ violated Oleka's right to due process, for two reasons. First, Oleka's assertion that he had no chance to review and explain this evidence is factually incorrect. Oleka's counsel introduced the fraudulent documents for admission to evidence but then withdrew them. Thus, Oleka was aware of the evidence and should have been prepared to address it. Second, after cross-examination, Oleka's counsel conducted redirect and addressed the asylum application. Furthermore, Oleka's counsel could have addressed any issues that she believed were insufficiently addressed during redirect in Oleka's seven-page declaration. Accordingly, Oleka has failed to show

---

[4] Together with Oleka's direct examination testimony, the IJ also considered five witnesses provided by Oleka.

13

that the IJ's reliance on the impeachment evidence violated his due process rights because Oleka's counsel had sufficient opportunities to respond to the impeachment evidence.

## III.    CONCLUSION

For the reasons above, we will deny the petition for review and affirm the BIA's order dismissing the appeal.