**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2270
_____

THAMOTHARAM PILLAI THAYALAN,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA,
Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A203-596-281)
Immigration Judge: Pallavi S. Shirole
_____

Argued: January 29, 2021

Before: RESTREPO, BIBAS, and PORTER,
*Circuit Judges*.

(Filed: May 10, 2021)
_____

Brian J. Slipakoff **[Argued]**
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

*Counsel for Petitioner Thamotharam Pillai Thayalan*

Anthony C. Payne
Jennifer A. Bowen **[Argued]**
Raya Jarawan
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent Attorney General*
*of the United States of America*

_____

OPINION OF THE COURT
_____

PORTER, *Circuit Judge*.

Thamotharam Pillai Thayalan is a native and citizen of Sri Lanka. On July 10, 2019, he was apprehended in California after illegally entering the United States. The Department of Homeland Security initiated removal proceedings, and Thayalan sought relief from removal in the form of asylum and withholding of removal under the Immigration and Nationality Act ("INA").

Thayalan testified that in 2007, when he was about sixteen years old, he was kidnapped and blindfolded by members of the Sri Lankan army and taken to an army camp. While he was detained, soldiers hit his head against a wall and punched him in the stomach. He claims that this mistreatment constitutes past persecution, entitling him to a presumption of a well-founded fear of future persecution. Thayalan also claims a well-founded fear of future persecution based on two incidents in 2019, when members of the Eelam People's Democratic Party ("EPDP") of Sri Lanka tried to extort money from him. Thayalan maintains that he was targeted for extortion because of the EPDP's false belief that he financially supported a rival political party.

The agency credited Thayalan's testimony, but ordered his removal to Sri Lanka. The agency determined that (1) the Sri Lankan army's mistreatment of Thayalan did not rise to the level of persecution, and (2) the EPDP members targeted Thayalan for extortion because they wanted his money, not because of disapproval of any political opinion. As a result, Thayalan failed to meet his burden of showing past persecution or a well-founded fear of future persecution on account of a ground protected by the INA and thus was ineligible for both asylum and withholding of removal.

Thayalan petitions for review of the order of removal. He contends that the agency's past-persecution determination contravenes this Court's precedents and that substantial evidence does not support the agency's determination about what motivated the EPDP's extortion efforts. We disagree with Thayalan on both counts, so we will deny the petition.

3

I

A

Thayalan was apprehended near the United States–Mexico border after making an illegal entry. Thayalan expressed to an asylum officer a fear of returning to Sri Lanka. The asylum officer found that Thayalan had demonstrated a credible fear of persecution. In proceedings before an immigration judge ("IJ"), Thayalan conceded the Department of Homeland Security's charges of removability and applied for asylum and withholding of removal.

B

Thayalan testified in support of his application. He told the IJ that in 2007, when he was about sixteen years old, he and other ethnic Tamils were kidnapped and blindfolded by members of the Sri Lankan army after a bomb went off during the Sri Lankan Civil War. He was taken to an army camp, where men tied his arms together, hit his head against a wall, and punched him in the stomach. He was released after two hours, and while he did not seek medical help, he did experience swelling on his head and pain in his stomach for three days.

Thayalan also testified about two incidents that occurred in March and April 2019, when members of the EPDP tried to extort him. Thayalan received a phone call from "the EPDP people" telling him that he "had to pay them money." A.R. 115. The EPDP told Thayalan that since he gave money to the Tamil National Alliance ("TNA"), a different political party, he also had to give money to the EPDP. The TNA was the ruling party in the Northern Province of Sri Lanka, where Thayalan resided. Before hanging up the phone, the EPDP told

Thayalan, "you know if you don't pay us money what will happen." A.R. 125. Thayalan knew of a bar owner who the EPDP shot and killed after he failed to comply with a demand for money.

Thayalan refused to make the demanded payment, and a few days after the phone call, EPDP members came to his store. They threatened to shoot Thayalan if he did not pay them a specified sum of money within three days. Rather than remit payment, Thayalan fled to Colombo, a city in a different part of Sri Lanka, for two weeks. The EPDP members came back to Thayalan's store after he fled, but did not search for him in Colombo.

Asked during his hearing if the EPDP was "asking you for money because you were a business owner," Thayalan replied that the EPDP asked him for money "[b]ecause I was doing business, and also they were falsely accusing me that I'm working for TNA, and I'm paying TNA the money." A.R. 130. Thayalan also testified that the EPDP wanted "revenge" on him "[b]ecause I'm a businessman, I work along with other Tamil groups and help the Tamil people." A.R. 115–16.

C

The IJ found that Thayalan "testified credibly and . . . sufficiently corroborated his claim." A.R. 57. But the IJ nevertheless denied Thayalan's application for asylum and withholding of removal. The IJ determined that the harm Thayalan experienced from the 2007 detention and beating did not amount to persecution. As for the 2019 incidents, the IJ found that Thayalan did not show the requisite connection between the extortion attempts and a protected ground, because the EPDP members were motivated to extort Thayalan by a desire

5

for money and not by any imputed pro-TNA political opinion. In the IJ's view, "the members of the EPDP seem[ed] to be targeting [Thayalan] because they believed he was able to pay another organization and, therefore, should also pay the EPDP." A.R. 60. And even if the EPDP members did harm Thayalan on account of a protected ground, the IJ concluded that he had not established a reasonable possibility that they would harm him in the future. The IJ also determined that, if Thayalan were removed, it would be reasonable for him to relocate within Sri Lanka to prevent any future harm at the hands of the EPDP. Thayalan thus failed to establish eligibility for asylum or withholding of removal. Accordingly, the IJ denied Thayalan's application and ordered his removal.

D

Thayalan appealed to the Board of Immigration Appeals ("BIA"), which upheld the IJ's decision.

The BIA agreed with the IJ that the harm done to Thayalan in 2007 did not amount to persecution. Turning to the 2019 extortion attempts, the BIA affirmed the IJ's determination that the EPDP members who threatened Thayalan "were motivated to extort [him] because he was a business owner who [sic] they perceived to have the financial means to contribute to the EPDP." A.R. 4 (citing A.R. 60–61). The BIA noted that the EPDP members never demanded that Thayalan stop supporting the TNA or insisted that he change his political opinions or support EPDP candidates. As a result, any pro-TNA opinion that the EPDP may have imputed to Thayalan was, at most, an "incidental, tangential, or superficial reason[]" for the extortion and threats by the EPDP members." A.R. 4. The BIA also concluded that Thayalan failed to show a reasonable likelihood that the EPDP would persecute him upon his

6

return to Sri Lanka or that he could not relocate within Sri Lanka to avoid any future harm. After agreeing with the IJ that Thayalan was ineligible for asylum, the BIA likewise adopted the IJ's determination that Thayalan could not meet the higher standard for withholding of removal.

This timely petition for review followed.

## II

We have jurisdiction over this petition for review of a final order of removal under 8 U.S.C. § 1252(a). Where, as here, "the 'BIA's opinion directly states that the BIA is deferring to the IJ, or invokes specific aspects of the IJ's analysis and factfinding in support of the BIA's conclusions,' we review both decisions." *Uddin v. Att'y Gen.*, 870 F.3d 282, 289 (3d Cir. 2017) (quoting *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 270 (3d Cir. 2012)).

We review challenges to the agency's factual findings under the familiar substantial-evidence standard. *See Romero v. Att'y Gen.*, 972 F.3d 334, 340 (3d Cir. 2020). Under our "highly deferential" review, "[t]he agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020) (quoting 8 U.S.C. § 1252(b)(4)(B)). "If a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003) (en banc).

"Whether an asylum applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence

7

standard."[1] *Voci v. Gonzales*, 409 F.3d 607, 613 (3d Cir. 2005). An agency determination about whether an asylum applicant has established the requisite nexus between the persecution he has suffered or will suffer and his protected characteristic is also reviewed for substantial evidence. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1, 483–84 (1992); *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 686 (3d Cir. 2015). We will not, however, defer to a factual finding that is "based on a

[1] We suggested last year that, where "[n]either party disputes the facts underlying [a petitioner's] past-persecution claim," we "review the BIA's application of our past-persecution standard to those facts de novo." *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020). In *Herrera-Reyes*, we applied de novo review to the question of whether the BIA misapprehended the legal methodology we have prescribed for assessing persecution. 952 F.3d at 108–09. We concluded that it was legal error for the agency to examine incidents of alleged past persecution in isolation from each other rather than cumulatively and to restrict qualifying harm to that inflicted on the petitioner herself, excluding harm to family members or close associates. *See id*. at 108–11. In contrast, where the agency does not misapprehend applicable law, we apply the substantial-evidence standard to an agency determination that an alien did not suffer harm rising to the level of persecution even where the underlying facts about how an alien was mistreated are undisputed. *See Jarbough v. Att'y Gen.*, 483 F.3d 184, 191–92 (3d Cir. 2007); *Al-Fara v. Gonzales*, 404 F.3d 733, 738–40 (3d Cir. 2005); *Chen v. Ashcroft*, 381 F.3d 221, 234–35 (3d Cir. 2004) (Alito, J.); *Abdille v. Ashcroft*, 242 F.3d 477, 483, 492–95 (3d Cir. 2001). We do so because the question of whether a particular fact pattern rises to the level of persecution is largely fact-driven.

misunderstanding of the law." *Doe v. Att'y Gen.*, 956 F.3d 135, 141 (3d Cir. 2020).

## III

To be eligible for asylum, an alien must demonstrate that he is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see id.* § 1158(b); *Sunuwar v. Att'y Gen.*, 989 F.3d 239, 244 n.2 (3d Cir. 2021). An alien can establish eligibility for asylum based on past persecution if he shows "(i) that he was targeted for mistreatment 'on account of one of the statutorily-protected grounds,' (ii) that the 'incident, or incidents' of mistreatment 'rise to the level of persecution,' and (iii) that the persecution was 'committed by the government or forces the government is either unable or unwilling to control.'" *Doe*, 956 F.3d at 141–42 (quoting *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003)). "A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution." *Toure v. Att'y Gen.*, 443 F.3d 310, 317 (3d Cir. 2006) (citing 8 C.F.R. § 208.13(b)(1)). An alien who has not suffered past persecution can establish eligibility for asylum by showing a "reasonable possibility" of future persecution on account of a protected ground. *Doe*, 956 F.3d at 151 (internal quotation marks omitted) (quoting *Lukwago v. Ashcroft*, 329 F.3d 157, 175 (3d Cir. 2003)). Persecution is on account of a protected ground only if that ground "was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i).

To be granted withholding of removal under the INA, an alien bears the heavier burden of proving that he would

more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion if returned to the proposed country of removal. *See* 8 U.S.C. § 1231(b)(3)(A); *Gonzalez-Posadas*, 781 F.3d at 684. An alien who establishes past persecution is entitled to a rebuttable presumption that he would more likely than not be persecuted if removed. *See Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir. 2008) (citing 8 C.F.R. § 1208.16(b)(1)). Because withholding of removal requires a showing of a greater-than-fifty-percent chance of persecution rather than just a reasonable possibility, "an applicant who cannot meet the standard for asylum will necessarily be unable to meet the standard for withholding of removal." *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 348–49 (3d Cir. 2008). As with asylum, persecution is not on account of a protected ground unless that ground is at least "one central reason" why the applicant was or will be targeted. *Gonzalez-Posadas*, 781 F.3d at 684–85 & n.6.

This case requires us to resolve two questions. First, did the agency err in determining that the Sri Lankan army's mistreatment of Thayalan does not rise to the level of persecution?[2] Second, does the record compel rejection of the agency's conclusion that the EPDP did not target Thayalan on account of a protected ground?

We answer each question in the negative. As a result, Thayalan's asylum and withholding-of-removal claims fail,

---

[2] If we concluded that Thayalan was subjected to persecution, a remand to the agency would be appropriate for a determination of whether the presumption of a well-founded fear of future persecution could be rebutted. *See Herrera-Reyes*, 952 F.3d at 112 (citing 8 C.F.R. § 208.13(b)(1)(i)).

10

and we need not address the agency's alternative grounds for denying Thayalan relief from removal.

## A

We consider first whether the 2007 detention and beating rises to the level of persecution. We emphasize at the outset of our analysis that the Sri Lankan army's treatment of Thayalan was deeply troubling. But the fact that an alien has been treated deplorably by his government does not necessarily mean that he has suffered persecution. "Persecution" is "an extreme concept." *Fatin v. INS*, 12 F.3d 1233, 1243 (3d Cir. 1993) (Alito, J.). "While it includes 'threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom,' . . . it 'does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.'" *Al-Fara v. Gonzales*, 404 F.3d 733, 739 (3d Cir. 2005) (quoting *Fatin*, 12 F.3d at 1240). Though a single incident may be extreme enough to constitute persecution, a past-persecution claim will usually be stronger where government actors "were engaged in a 'program or campaign to drive away or subjugate'" the applicant. *Voci*, 409 F.3d at 614 (ellipsis omitted) (quoting *Fatin*, 12 F.3d at 1240 n.10).

The BIA concluded that, although Thayalan was only sixteen years old at the time of the incident, the harm he suffered "does not rise to the level of persecution." A.R. 3–4. It emphasized that Thayalan did not seek medical care for his injuries. And it cited three of our past decisions in support of its conclusion: *Chen v. Ashcroft*, 381 F.3d 221, 223, 234–35 (3d Cir. 2004) (Alito, J.), *Kibinda v. Attorney General*, 477 F.3d 113, 119–20 (3d Cir. 2007), and *Doe*, 956 F.3d at 143.

11

The agency's reliance on *Chen* and *Kibinda* was proper, but its discussion of *Doe* borders on error.

In *Chen*, the petitioner was informed by Chinese officials that his fiancée's child would have to be aborted. 381 F.3d at 223. When those officials came to the petitioner's home looking for his fiancée, the petitioner refused to disclose her whereabouts. *Id.* The officials began hitting him with sticks, and the petitioner fought back with a plumbing tool. *Id.* The petitioner's parents intervened to end the scuffle. *Id.* The officials left, warning the petitioner that he would be arrested if his fiancée "did not report for an abortion in three days." *Id.* We concluded that the petitioner had not suffered past persecution because his "scuffle with the local officials does not appear to have been serious" and the petitioner "never alleged that this altercation resulted in any injuries that required medical treatment." *Id.* at 235.

In *Kibinda*, the petitioner, a member of the Angolan army, was detained for five days for violating a curfew order. 477 F.3d at 117. At one point during his detention, a guard threw a heavy object that struck the petitioner's jawbone, causing a laceration that required seven stiches. *Id.* We held that the petitioner's "detention by the Angolan army and the attendant circumstances of that detention simply do not rise to the level of persecution as we have defined it" because the mistreatment, "as offensive as it may be, was far from unusual or extreme." *Id.* at 119. We explained that "the injury [the petitioner] suffered . . . , though it left a scar, was certainly not severe, requiring as it did only a few stitches." *Id.* While agreeing with the agency's conclusion that the conduct did not amount to persecution, we also cautioned that we were not "suggest[ing] that the severity of an injury should be measured in stitches." *Id.* at 120. But because the petitioner "provided no other objective

12

evidence to demonstrate that the single injury he suffered was severe enough to constitute persecution under our stringent standard," we upheld the agency's decision. *Id.*

These cases support the BIA's decision here because they show that physical abuse, even in the context of detention, *may* not rise to the level of past persecution, especially in the absence of concrete and menacing threats of violence or death. An alien who can show an "escalating pattern of mistreatment" will tend to have a stronger past-persecution claim. *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 112 (3d Cir. 2020); *accord Gjetani v. Barr*, 968 F.3d 393, 397 (5th Cir. 2020) ("Persecution . . . has the quality of a sustained, systematic effort to target an individual on the basis of a protected ground." (emphasis omitted)). Thayalan has not shown such a pattern here. Instead, the mistreatment he faced was a true one-off. There is no indication that Thayalan was threatened or that the Sri Lankan army pursued him after his release. And, like the petitioner in *Kibinda*, he has not produced evidence to show that he suffered any severe or protracted injury (whether or not of a physical nature) that would further support his past-persecution claim. In fact, his detention was far shorter than the five-day detention the petitioner suffered in *Kibinda*. For these reasons, considering the totality of the circumstances, we uphold as supported by substantial evidence the agency's finding that Thayalan has not suffered past persecution.

While we leave undisturbed the BIA's ultimate disposition of this case, we pause to comment on its treatment of our decision in *Doe*. The BIA cited *Doe* for the proposition that "isolated incidents of beatings that do not result in serious injury do not rise to the level of persecution." A.R. 4 (citing *Doe*, 956 F.3d at 143). That was a poor paraphrasing of *Doe*'s quotation of our decision in *Voci*. It is true that in *Voci*, we

13

suggested that "isolated incidents that do not result in serious injury do not rise to the level of persecution." 409 F.3d at 615. But the BIA treated this as a hard-and-fast rule. It is not. We explained in *Doe* that "[n]either *Chen* nor *Kibinda* foreclosed the possibility that outrageous conduct, even if limited to a single event without physical harm, could rise to the level of persecution." *Doe*, 956 F.3d at 145 n.5; *see id.* at 145 ("We have never held that persecution requires more than one incident. Rather, we have left open the possibility that a single incident, if sufficiently egregious, may constitute persecution."). In fact, we held in *Doe* that the BIA "committed legal error by finding that a single beating without severe physical injury" is never persecution.[3] *Id.* at 146.

Thayalan contends that *Doe* "refutes [the] very foundations" of the BIA's decision in this case. Pet'r Br. 13. But a comparison of the facts of *Doe* to the facts here reveals otherwise. The petitioner in *Doe* was a man born and raised in Ghana, where he had a secret homosexual relationship with another man. *Doe*, 956 F.3d at 139. He knew that being gay in Ghana was considered unacceptable, so he refrained from speaking to his family about his sexual orientation. *Id.* One morning in January 2016, the petitioner's father "unexpectedly entered [his] bedroom at the break of dawn and discovered him having sex with his partner." *Id.* His father began shouting that

---

[3] In *Blanco v. Attorney General*, 967 F.3d 304 (3d Cir. 2020), which we decided a few weeks after the BIA's decision in this case, we reiterated that the lack of physical harm from an attack "is not dispositive in establishing past persecution" where an applicant also experienced concrete and menacing threats. *Id.* at 312. "[E]valuating past persecution is not as simple as comparing the severity of each injury." *Id.*

his son was having sex with a man and called on others to witness the petitioner's conduct. *Id.* The petitioner's father accused his son of bringing shame to their family and promised that he would face punishment for his homosexuality. *Id.*

Upon hearing the petitioner's conflict with his father, "a crowd of neighbors gathered at [the petitioner's] house, forming a violent mob." *Id.* "Together with his father, the mob began to beat the two young men with stones, wooden sticks, and iron rods, and dragged them into a courtyard." *Id.* Some in the mob wanted to report the petitioner and his partner to the police, "but others began to argue over how best to punish them: death by burning or beheading." *Id.* The petitioner was then doused with kerosene, while members of the crowd called for him to be set on fire. *Id.* Someone in the mob brandished a sword. *Id.* "Fearing that his life was in danger, [the petitioner] managed to escape and ran naked, hurt and bleeding to a friend's house about ten minutes away." *Id.* He "told his friend about the attack and about his sexual relationship with his partner." *Id.* His friend became worried that they could both be killed if it were discovered that the petitioner was hiding at his house. *Id.* Too frightened to call the police or seek medical care, the petitioner fled to Togo. *Id.* But he feared being attacked there, too. *Id.* So with a friend's help, he retrieved his passport from his home and flew to Ecuador, eventually entering the United States without valid documents. *Id.* at 139–40. After arriving in the United States, the petitioner "heard that his father has publicly disowned him for being gay, that he is still looking for him, and that he intends to kill him if he finds him." *Id.*

The BIA determined that the petitioner's beating did not rise to the level of persecution because it was a single, isolated incident that did not cause serious physical injury. *Id.* at 145.

15

We rejected its determination. *Id.* "In addition to having his life credibly threatened by accompanying acts of violent intimidation," we explained, the petitioner "suffered actual physical harm from the beating, not to mention the emotional suffering he has endured." *Id.* The petitioner's own father encouraged a violent mob to attack him, and the situation progressed to the point that "[a]ll that was left for the mob to do was to cut off his head or set him on fire." *Id.* at 144.

The facts here are markedly different—Thayalan did not suffer physical mistreatment or threats that, considered cumulatively, compel the conclusion that he suffered persecution. Unlike *Doe*, there is no evidence in this record that Thayalan's oppressors continued to pursue him even after he was physically attacked. And it appears that Thayalan did not seek medical care because he did not feel that he needed it, not because he was unable to do so. *Cf. Doe*, 956 F.3d at 146 (noting that the petitioner "did not seek medical care because he feared for his well-being" rather than because he "did not require medical treatment" (emphasis and internal quotation marks omitted)). The agency may consider whether a physical beating caused enough harm to require medical care in assessing a claim of past persecution so long as it does not give that consideration dispositive weight. *See Chen*, 381 F.3d at 235 (concluding that a petitioner's mistreatment "does not appear to have been serious" in part because he did not suffer "any injuries that required medical treatment"); *Jarbough v. Att'y Gen.*, 483 F.3d 184, 191 (3d Cir. 2007) (upholding a finding of no past persecution where the petitioner "suffered bruising" from an attack but "did not go to a doctor" because "his injuries did not 'require immediate medical intervention'"); *Voci*, 409 F.3d at 614 (concluding that the fact that a beating required an "extended hospitalization" weighed in favor of a

16

finding of past persecution); *Doe*, 956 F.3d at 145 (noting that this Court does not "condition[] a finding of past persecution on whether the victim required medical attention or on whether he was too hurt to escape his aggressors").

In short, Thayalan "has provided no other objective evidence to demonstrate that the single injury he suffered was severe enough to constitute persecution under our stringent standard." *Kibinda*, 477 F.3d at 120. And he has given no explanation for his decision to remain in Sri Lanka for over a decade after his detention and beating, which further under-mines his claim of past persecution. *See Gjetani*, 968 F.3d at 399 (explaining that when "an alien has endured a threat or assault but has nevertheless chosen to stay in his home country for a period of time," that "choice to stay tends to weaken [a] claim of persecution"). We thus uphold the agency's determi-nation that the harm Thayalan suffered does not amount to past persecution. Thayalan's attempt to establish eligibility for asy-lum based on his mistreatment by the Sri Lankan army fails.

B

We now turn to the agency's nexus finding with respect to the 2019 extortion attempts. Thayalan does not contend that these incidents constitute past persecution. Rather, he argues that they give rise to a reasonable possibility that he would be persecuted on account of an imputed pro-TNA political opin-

ion if he were removed to Sri Lanka.[4] The agency disagreed. It ruled that the EPDP's extortion efforts were not, as Thayalan contends, centrally motivated by an imputed pro-TNA political opinion, and thus do not give rise to a reasonable possibility of future persecution on account of a protected ground. We conclude that this finding is supported by substantial evidence.

As we previously noted, the INA requires that an applicant for asylum and withholding of removal demonstrate that his protected characteristic "was or will be at least one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i) (asylum); *see Gonzalez-Posadas*, 781 F.3d at 684–85 & n.6 (holding that the "one central reason" standard applies in the context of withholding of removal). "For a protected characteristic to qualify as 'one central reason', it must be an essential or principal reason for the persecution." *Gonzalez-Posadas*, 781 F.3d at 685. As a result, neither asylum nor withholding of removal may be granted "when the characteristic at issue 'played only an incidental, tangential, or superficial role in persecution.'" *Id.* (quoting *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 130 (3d Cir. 2009)). The characteristic "must be *both* a but-for cause of [the] persecution *and* it must play more than a minor role that is neither incidental nor tangential to another reason for the harm or a means to a non-protected end." *Matter of A-B-*, 28 I.

---

[4] An alien may establish eligibility for asylum by showing that he was targeted because of a political opinion that was attributed to him, but that he did not actually hold. *See Singh v. Gonzales*, 406 F.3d 191, 196 (3d Cir. 2005). In determining whether an alien was persecuted on account of an imputed political opinion, "we focus on whether the persecutor has attributed a political view to the victim and acted on that attribution." *Id.*

& N. Dec. 199, 211 (A.G. 2021). A persecutor may "have more than one central motivation for his or her actions." *Ndayshimiye*, 557 F.3d at 129.

Thayalan contends that "the persecutors' own statements" reveal that "the EPDP targeted [him] because of his purported support for the TNA." Pet'r Br. 19. Thayalan first testified that he was targeted by the EPDP because he was "a businessman." A.R. 116. But later in his testimony, he stated that the EPDP members who sought to extort him "falsely accus[ed]" him of "working for TNA" and "paying TNA the money." A.R. 130. It is this latter piece of testimony that Thayalan now relies on in attacking the agency's nexus finding.

The BIA credited this testimony, but concluded that Thayalan still failed to meet his burden of establishing nexus. "While this evidence demonstrates that the EPDP members believed [Thayalan] provided support for the TNA," the BIA reasoned, "it does not establish that [his] . . . imputed political opinion was a characteristic the EPDP members sought to overcome." A.R. 4 (citing *Matter of L-E-A-*, 27 I. & N. Dec. 40, 44 & n.2 (B.I.A. 2017), *aff'd in part and rev'd in part*, 27 I. & N. Dec. 581 (A.G. 2019)). The BIA explained that the EPDP members never demanded that Thayalan "stop supporting the TNA" or "change his political opinion and support" EPDP candidates, and that Thayalan had not "presented any evidence that [the] EPDP members have any particular animus toward . . . supporters of the TNA." A.R. 4. Defending the BIA's decision, the government argues that the false accusations made by the EPDP members do not render unreasonable the agency's view that they "targeted [Thayalan] due to . . . their perception that, as a business owner, he had the means to pay their extortion demands." Resp't Br. 18.

19

The applicable standard of review places a heavy burden on Thayalan. "[T]o obtain judicial reversal of the BIA's determination" that the EPDP did not target him on account of a protected ground, "he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find" the nexus requirement satisfied. *Elias-Zacarias*, 502 U.S. at 483–84. It is "[q]uite beside the point" that the record may be adequate to support the conclusion that at least one central reason for the efforts to extort Thayalan was an imputed political opinion. *Id.* at 481 n.1. The substantial-evidence standard does not permit this Court to re-weigh evidence or to substitute its own factual determinations for those of the agency. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). We are to decide only whether a reasonable factfinder could agree with the agency's determination—that is, whether the agency's determination is supported by substantial evidence. *See Dia*, 353 F.3d at 247–49; *Gonzalez-Posadas*, 781 F.3d at 688 (explaining that even when "there is more than one way to view the record," this Court is "required to uphold the decision of the [agency]" if there is substantial evidence to support it).

Thayalan's challenge to the nexus finding fails because the record provides ample support for the agency's view that the EPDP did not target Thayalan principally because of an imputed political opinion. The BIA properly relied on the fact that the EPDP members never tried to get Thayalan to stop supporting—financially or otherwise—any other political party or political viewpoint to support its conclusion that any imputed pro-TNA political opinion was, at most, of minor interest to the EPDP. And while the EPDP members did mention Thayalan's alleged financial support for the TNA during their first extortion attempt, the agency took the reasonable view that the

20

EPDP members inferred from that support only that Thayalan had the wherewithal to fund the EPDP in addition to the TNA. Considering the strength of the BIA's reasoning and the entirety of the record, we cannot conclude that any reasonable adjudicator would be compelled to find that an imputed pro-TNA political opinion was a central reason for the EPDP's decision to target Thayalan for extortion. The agency's conclusion that getting Thayalan's money was the EPDP's only central motivation for its criminal behavior is therefore supported by substantial evidence. As this Court has held before, an alien targeted out of a simple desire for money has not experienced persecution on account of a ground protected by the INA. *See Gonzalez-Posadas*, 781 F.3d at 686; *Shehu v. Att'y Gen.*, 482 F.3d 652, 657 (3d Cir. 2007). Thayalan has not shown that his mistreatment by the EPDP gives rise to a reasonable possibility of future persecution based on an imputed political opinion.

\* \* \*

To sum up, we uphold as supported by substantial evidence the agency's findings that (1) the 2007 detention and beating by the Sri Lankan army did not rise to the level of past persecution, and (2) the 2019 extortion attempts by the EPDP were not motivated by an imputed political opinion.[5] Thayalan

---

[5] We also disagree with Thayalan that the IJ erred by failing to analyze whether there is a "pattern or practice of persecution against ethnic Tamils." Pet'r Br. 23. Thayalan did not make a pattern-or-practice argument to the IJ, and the BIA declined to consider an "issue . . . raised for the first time on appeal." A.R. 5. Yet Thayalan now contends that the IJ should have conducted a pattern-or-practice analysis even though he failed to raise the issue. The applicable regulation, 8 C.F.R. § 1208.13(b)(2)(iii), provides in relevant part:

> [An IJ] shall not require [an] applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if . . . [t]he applicant establishes that there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion.

We do not think that this regulation required the IJ to specifically analyze in her decision whether Thayalan established a pattern or practice of persecution, or that the BIA was required to entertain an argument that could have been raised before the IJ. *See Ye v. Lynch*, 845 F.3d 38, 45 (1st Cir. 2017) (holding that where an applicant "did not argue before the IJ that, independent of his claims of past persecution, he had a well-founded fear of future persecution because there was a pattern or practice of persecuting Christians in China," the "BIA did not err in concluding that the argument was not exhausted"). Thayalan relies on *Banks v. Gonzales*, 453 F.3d 449 (7th Cir. 2006), where the Seventh Circuit held that 8 C.F.R. § 1208.13(b)(2)(iii) "governs not only the proofs at the hearing but also an IJ's process of reasoning, and it must be followed whether or not an alien draws it to the agency's attention." *Id.* at 452. But even assuming the Seventh Circuit's interpretation of the regulation is correct, *see Vakeesan v. Holder*, 343 F. App'x 117, 127 (6th Cir. 2009) (unpublished opinion) (disagreeing with *Banks*), it does not follow that an alien need not preserve the argument that he is eligible for asylum even if he cannot show that he would be singled out for persecution. *See*

22

is thus not eligible for asylum. And because he is not eligible for asylum, he is "unable to meet the [higher] standard for withholding of removal." *Gomez-Zuluaga*, 527 F.3d at 348–49. We therefore uphold the agency's denial of both forms of relief from removal.

---

*Banks*, 453 F.3d at 453 (noting that the applicant, by claiming asylum based on the Liberian government's mistreatment of its enemies, preserved the pattern-or-practice issue); *Aguilar-Mejia v. Holder*, 616 F.3d 699, 704 (7th Cir. 2010) ("In *Banks*, . . . we still required the applicant to preserve the issue.").

Thayalan did not claim asylum based on "systematic, pervasive, or organized" persecution of Tamils by the Sri Lankan government; he claimed asylum based on a single detention and beating in 2007 and two extortion attempts more than a decade later. *Gonzalez-Posadas*, 781 F.3d at 687 & n.8 (internal quotation marks omitted) (quoting *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005)). As the BIA acknowledged, Thayalan "testified generally on cross-examination that Tamils are attacked in Sri Lanka." A.R. 5. But Thayalan's asylum claim was based on a fear of being singled out individually for persecution, not a fear of pervasive attacks on Tamils. *Cf. Sukwanputra v. Gonzales*, 434 F.3d 627, 630–31, 637 (3d Cir. 2006). In these circumstances, we will not fault the IJ for failing to include a pattern-or-practice analysis in her decision or the BIA for deeming the issue unpreserved and declining to remand the case. *See Prabhudial v. Holder*, 780 F.3d 553, 555 (2d Cir. 2015) (per curiam) ("[T]he BIA may refuse to consider an issue that could have been, but was not, raised before an IJ.").

## IV

For the foregoing reasons, we will deny the petition for review. The stay of removal this Court previously granted is vacated.