**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1425
_____

MARIA RUBIDIA ANDRADE; G.E.C.-A.,
Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an
Order of the Board of Immigration Appeals
(Agency Nos. A209-305-292 & A209-305-293)
Immigration Judge:  John B. Carle
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
February 1, 2024
_____

Before:  CHAGARES, *Chief Judge*, RESTREPO and FREEMAN, *Circuit Judges*

(Filed: October 29, 2024)

_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

FREEMAN, *Circuit Judge*.

Maria Rubidia Andrade petitions for review of a Board of Immigration Appeals ("BIA") decision dismissing an appeal from the Immigration Judge's ("IJ") denial of asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] For the reasons that follow, we will deny the petition.

I.[2]

Andrade is a native and citizen of El Salvador who has been in removal proceedings since September 2016. She applied for asylum, withholding of removal, and CAT protection, claiming to face persecution and torture in El Salvador based on her political opinion and membership in three particular social groups ("PSGs").

At a hearing before the IJ, Andrade testified about an event in June 2016 when she was riding a bus with her second cousin, 15-year-old Jorge Laiva Rosales, Jorge's friend Elando Torres, and several others. A group of armed gang members stopped the bus. Jorge and Elando left the bus and fled, and the bus continued on. Jorge's parents and the police later went to look for him and soon learned that both Jorge and Elando had been killed. Andrade believes the killing was by a rival gang.

Andrade further testified that, about two weeks later, two or three armed men threatened her and told her that if she did not keep quiet about the attack on Jorge and Elando, they would kill her and her son. The following month, the men approached her a

---

[1] Andrade's minor son, G.E.C.-A., is a derivative beneficiary of her asylum application. Because he raised no independent claims, we will refer only to Andrade in our discussion.

[2] We write for the parties and therefore recite only those facts pertinent to our decision.

second time, now demanding $100 per month to "keep control" of her, telling her they knew that Jorge was her cousin, and again threatening to kill her and her son if she said anything about the incident. They took all the money she was carrying at the time. She fled to the United States later that month.

Andrade testified that she did not report these incidents to the police. She believes that the police cannot be trusted because they may be working with the gangs. Andrade explained that this belief is due to the experience of her first cousin, Marcos Ramon Rivera, at whose house she worked. Marcos had a dispute with a police officer in 2015. When Marcos reported the dispute to policemen in another town, he was shot at, arrested, and beaten. He ultimately was shot to death in May 2017, although Andrade does not know whether a gang or the police killed him. Andrade fears that she, too, might be killed, because she was close with her cousin Marcos.

The IJ denied Andrade's asylum claim, concluding that she did not experience past harm rising to the level of persecution, failed to present cognizable PSGs, and did not establish a nexus between PSG membership and the harm she fears. The IJ also denied her withholding and CAT claims.

Andrade appealed to the BIA, which affirmed the IJ's denial of her asylum application. The BIA agreed with the IJ that Andrade failed to establish that her proposed PSGs were cognizable and that a protected ground was at least one central reason for her persecution. Although the BIA acknowledged that the IJ failed to address Andrade's political opinion claim, the BIA observed that she did not present testimony

3

related to such a claim. The BIA also affirmed the IJ's dismissal of Andrade's applications for withholding of removal and CAT protection.

Andrade timely filed a petition for review of the BIA's decision.

II.[3]

To be granted asylum, Andrade was required to show that she experienced past persecution or has a well-founded fear of future persecution "on account" of a statutorily protected ground, including membership in a PSG or for holding a political opinion. *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006). For withholding of removal, Andrade had to make a similar showing under a more stringent standard: she was required to show a "clear probability" of persecution on account of a protected ground. *See Ilchuk v. Att'y Gen.*, 434 F.3d 618, 624 (3d Cir. 2006); *Abdulrahman v. Ashcroft*, 330 F.3d 587, 591 n.2 (3d Cir. 2003).

We review the BIA's findings, including whether Andrade demonstrated past persecution or a well-founded fear of persecution, for substantial evidence. *See Thayalan v. Att'y Gen.*, 997 F.3d 132, 137–38 (3d Cir. 2021). Under this highly deferential standard, we will not disturb the BIA's findings unless a reasonable adjudicator would be compelled to make a contrary finding. *Id.* at 137.

---

[3] The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b) and 1240.15. We have jurisdiction to review the final order of removal under 8 U.S.C. § 1252(a)(1).

A.

Andrade claims that she established that her PSGs are cognizable.[4] We review de novo the ultimate question of whether a PSG is cognizable. *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543, 555–57 (3d Cir. 2018). To qualify as a PSG, a proposed group must, among other things, be defined with particularity and be socially distinct within the society in question. *See id.* at 547. "Particularity" means that the group has discrete and definable boundaries that are not "amorphous, overbroad, diffuse, or subjective," *id.* at 552 (citation omitted), while "social distinction" refers to whether people in the society perceive the proposed group as separate or distinct, *id.* at 550. We review the BIA's factual findings on particularity and social distinction for substantial evidence. *See Inestroza-Tosta v. Att'y Gen.*, 105 F.4th 499, 518 n.19 (3d Cir. 2024).

Andrade proffered three PSGs: (1) "[i]mputed or actual informants, witnesses and victims of crimes committed by the gangs and other recognized criminal groups, or by members of the security forces"; (2) "[p]ersons perceived by the gang as contravening its rules or resisting its authority"; and (3) "[f]amily members of Marcos Ramon Rivera [and] Jorge Rosales Laiva." AR 146. The BIA agreed with the IJ that Andrade's PSGs

---

[4] Andrade disputes the IJ's determination that she did not experience harm rising to the level of past persecution. The BIA did not rely on this aspect of the IJ's decision, however, instead relying on other grounds to dismiss her appeal. We review the BIA's decision and only those portions of the IJ's decision that the BIA adopts or defers to. *Quinteros v. Att'y Gen.*, 945 F.3d 772, 780-81 (3d Cir. 2019). We therefore will not consider the IJ's determination that Andrade did not experience harm rising to the level of persecution.

Andrade also disputes the BIA's finding that she did not establish a nexus between persecution and a protected ground. We need not reach that issue because the cognizability determination is dispositive.

5

are not cognizable. We agree with the BIA's conclusion and hold that its findings on particularity are supported by substantial evidence.

"Particularity" demands that a PSG have discrete boundaries capable of a common, accepted definition. *S.E.R.L.*, 894 F.3d at 553. Andrade's first PSG— "[i]mputed or actual informants, witnesses and victims of crimes committed by the gangs and other recognized criminal groups, or by members of the security forces"—lacks particularity because it is both diffuse and vaguely defined. And her second PSG— "[p]ersons perceived by the gang as contravening its rules or resisting its authority"— fares no better. Although she argues that this PSG is discernible and definable, she provides no record support for this assertion, so we cannot conclude that the BIA erred.

Andrade's final PSG is based on kinship. Andrade directs us to her testimony that she lived and worked with various family members and was "close" with Marcos. AR 126. But Andrade's close relationship with some members of her extended family does not compel a conclusion that all family members of Marcos Ramon Rivera and Jorge Laiva Rosales constitute a particular group or are seen as a distinct group in Salvadoran society.

As the BIA observed, "family may be deemed a particular social group in some instances." App. 5. But such a determination depends on the facts of the particular case at hand. *See S.E.R.L.*, 894 F.3d at 555. In this case, Andrade's kinship claim relies on her relationship with her first and second cousins, not her immediate family members. Andrade does not provide specific facts allowing us to determine that all extended family members of Jorge and Marcos are perceived by Salvadoran society as a members of a

6

distinct social group. *See Romero v. Att'y Gen.*, 972 F.3d 334, 342 (3d Cir. 2020) (rejecting a kinship PSG based on membership in the individual's stepdaughter's family for lack of social distinction). Additionally, because all "family members" are included, we cannot discern how many degrees of relationship the PSG comprises. The PSG thus lacks the discrete and definable boundaries necessary for particularity. Andrade thus has not provided evidence to compel a conclusion that the PSG is particular and socially distinct. *See S.E.R.L.*, 894 F.3d at 552.

Andrade next argues that she demonstrated persecution on account of a political opinion because she "testified that the gang was trying to control her, to suppress her ability to speak out against their violence, and that the consequence for violating their will was death." Andrade Br. 31. She claims that the failure of the IJ to adjudicate this claim warrants remand. We are not persuaded.

The BIA acknowledged that the IJ did not expressly address this claim, but correctly observed that Andrade presented no testimony related to any political opinion. To be sure, the record reflects that Andrade testified that the purpose of the extortion and threats was to keep control of her so that she would not identify Jorge's killers to the police. But she never testified that she held a specific political opinion related to gangs. Moreover, when the IJ inquired at the hearing about whether Andrade was pursuing a separate political opinion claim, her counsel informed the IJ that her political opinion was "sort of encompassed in" the proposed PSGs. Given the lack of evidence and counsel's concession, we see no basis for remanding this claim.

Finally, Andrade contends that she benefits from an unrebutted presumption of

7

future persecution based on her experience of past persecution. Because we agree with the BIA that Andrade did not establish that she experienced past persecution on account of a protected ground, she is not entitled to such a presumption. *See Lukwago v. Ashcroft*, 329 F.3d 157, 174 (3d Cir. 2003). We therefore conclude that the BIA properly denied Andrade's applications for asylum and withholding of removal.

B.

To prevail on her CAT claim, Andrade bore the burden to establish that she more likely than not would be tortured if removed. *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017) (citing 8 C.F.R. § 1208.16(c)(2)). This entails a two-step inquiry: the agency must first conduct a fact-finding inquiry to assess what is likely to happen to her if she is removed, and then must consider whether that likely harm meets the legal definition of torture. *Id.* at 516. Torture refers to an extreme form of cruel and inhuman treatment, which is inflicted by or with the acquiescence of a public official and is intended to inflict severe physical or mental pain and suffering. 8 C.F.R. § 208.18(a)(1), (2). We review the BIA's findings about the likelihood of torture for substantial evidence. *See Wang v. Ashcroft*, 368 F.3d 347, 350 (3d Cir. 2004). For instance, although Andrade argues that both her testimony and documentary evidence show that there are "corrupt connections between the gangs and Salvadoran law enforcement authorities," Andrade Br. 38, such generalized evidence does not establish that Andrade personally faces a likelihood of torture, *see Wang*, 368 F.3d at 350. Similarly, while the threats and extortion that Andrade experienced are reprehensible, the record does not compel a conclusion that they constitute "an extreme form of cruel and inhuman treatment" constituting torture. 8

8

C.F.R. § 208.18(a)(2).

*     *     *

For the foregoing reasons, we will deny the petition for review.

9