**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 24-2336

————————

MINERVA CARBAJAL-RECINOS;
DELMER ORLANDO CARBAJAL-DUQUE;
J.S. C.-C ; Y.S.C.-C.,

Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

————————

On Petition for Review of a
Decision of the Board of Immigration Appeals
(Agency Nos. 1:A208-273-735; 1:A208-273-674, 1:A208-273-736 & 1:A208-273-737)
Immigration Judge: Mary C. Lee

————————

Submitted under Third Circuit L.A.R. 34.1(a)
on June 26, 2025

Before: MONTGOMERY-REEVES, ROTH and AMBRO, Circuit Judges

(Opinion filed: January 6, 2026)

————————

OPINION[*]

————————

———————————————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**ROTH**, Circuit Judge

Minerva Carbajal-Recinos, joined by her nephew Delmer Carbajal-Duque, petition for review of the Board of Immigration Appeals' decision denying their applications for asylum and withholding of removal.[1] For the reasons that follow, we will deny their petition.

Petitioners are natives of Las Brisas, Honduras, where, beginning in June 2007, they lived on a family farm purchased by Carbajal-Recinos' brother (and Carbajal-Duque's uncle) Isaias. At some point in 2008, local gang-members affiliated with Mara Salvatrucha (MS-13), led by a high-ranking neighbor of the Carbajals, began pillaging livestock, crops, and money from the farm, and pressuring male members of the Carbajal family to join their gang. In December 2008, the gang began extorting Isaias for increasingly large sums of money. In July 2009, the sums demanded outgrew Isaias' ability to pay, and he reported the extortion to the police. The gang's harassment then escalated, culminating in August 2009 with the murder of Isaias and his son Carlos.

After Isaias' death, MS-13 members upped their pressure on the remaining Carbajals to abandon the farm and continued to pillage the farm's livestock. Then, in February 2012, MS-13 members carried out a drive-by-shooting into Carbajal-Recinos'

---

[1] Carbajal-Recinos's asylum application includes multiple derivative applicants who do seek independent relief, and whom we do not separately address in this opinion.

2

home as a way of threatening her husband into joining their gang.[2]  Matters escalated further in April 2012, when MS-13 members murdered Isaias' wife on the way home from the bank "because they knew she had money" with her.[3]  Shortly afterwards, MS-13 members came into Carbajal-Duque's bedroom and told him that he and his siblings would be killed if his family did not abandon the farm within two weeks.  At some point, gang members also shot bullets towards Carbajal-Recinos and other members of her family as they were on their way home from church.

Over time, these threats and acts of harassment drove each member of the Carbajal family to flee Las Brisas (culminating in the sale of the farm in 2013).  Carbajal-Recinos' parents (Carbajal-Duque's grandparents) left for Colon in 2012, followed that same year by Carbajal-Duque.[4]  Carbajal-Recinos joined them in Colon in 2013.  Much of the remaining family fled to the United States, although two of Carbajal-Recinos' siblings (and one of Carbajal Duque's siblings) continue to reside in Honduras.

Petitioners lived safely in Colon, about 8 hours away from Las Brisas, until 2015, when a man on a motorcycle arrived in Colon and began asking questions concerning the whereabouts of Carbajal-Recinos.  At around the same time, Carbajal-Duque was told by a family living about 15 minutes away from him that gang members had been inquiring

---

[2] In her application for asylum, Carbajal-Recinos further stated that gang-members informed Carbajal-Recinos' husband that they would kill his entire family unless he joined their gang.  Carbajal-Recinos did not repeat this assertion (i.e., that **she** was threatened with death if her husband did not join MS-13) in either her pre-hearing affidavit or her testimony, nor does she rely upon it in her briefing.

[3] C.A.R. 266.

[4] Although it is unclear from the record whether the senior Carbajals moved to Colon in 2011 or 2012, the IJ's finding that they moved in 2012 is supported by substantial evidence.

into where his family lived.[5]  Carbajal-Duque also learned that the MS-13 leader responsible for the murder of his aunt, uncle, and cousin had moved in nearby.  Concerned that these events signaled a renewed threat to their lives, and that MS-13 might wish to kill Carbajal-Duque to prevent him from avenging Isaias, Petitioners fled to the United States in June of 2015.

Upon arrival in the United States, Carbajal-Recinos and Carbajal-Duque were charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i).  They conceded that charge, but applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  Carbajal-Recinos and Carbajal-Duque's petitions were subsequently consolidated, and their joint merits-hearing was held on October 29, 2019.  At that hearing, their attorney conceded that the harms they had faced did not amount to past persecution, but argued that those harms supported a finding that they were at risk of persecution and/or torture if returned.

After hearing from both Carbajal-Recinos and Carbajal-Duque, and deeming them both to be credible, the IJ held that they had nevertheless failed to show (1) that their proposed family-based social group was cognizable, and (2) that their family membership

---

[5] In Carbajal-Duque's pre-hearing affidavit, he states that he was also threatened at gun-point in Colon by gang-members who said they had unfinished business with him, and that he should purchase for himself a cemetery plot.  He did not repeat this incident in his hearing-testimony, during which he said that he had never been "confronted by anyone in Colon who threatened" him, and confirmed that he had only received word indirectly that the gang was still looking for him.  Neither the IJ nor the BIA relied upon this alleged incident, and Petitioners do not refer to it in their briefing.

was one central reason for MS-13's interest in them.[6] It therefore denied their petitions for asylum and withholding of removal.[7] The BIA affirmed, based solely on the IJ's nexus determination. Carbajal-Recino and Carbajal-Duque then petitioned this Court for review.

The BIA had jurisdiction under 8 U.S.C. § 1103(g) and 8 C.F.R. §§ 1003.1(b) and 1240.15, while we have jurisdiction pursuant to 8 U.S.C. § 1252(a). We review the BIA's legal determinations *de novo*.[8] We review the BIA's factual findings, including "whether an asylum applicant has established the requisite nexus between the persecution he has suffered or will suffer and his protected characteristic" under the substantial evidence standard, which requires us to affirm "'unless any reasonable adjudicator would be compelled to'" reject the BIA's determination.[9] Where the BIA "affirms and partially reiterates the IJ's discussions and determinations," we review both the BIA's and IJ's opinions, but only insofar as the IJ's opinion informed the grounds ultimately relied upon by the BIA.[10]

To show statutory eligibility for asylum, an applicant must "establish that race, religion, nationality, membership in a particular social group, or political opinion was or

---

[6] The IJ further held that Petitioners had conceded they did not suffer harm amounting to past persecution. Although Petitioners challenged that determination before the BIA, they did not renew this challenge in their opening brief, and we do not address it. *See Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011).

[7] The BIA further denied Petitioners' application for CAT protections on the ground that they had not previously experienced torture and could reasonably relocate within Honduras. Petitioners do not challenge this determination.

[8] *See Lopez v. Att'y Gen.*, 142 F.4th 162, 170 (3d Cir. 2025).

[9] *Thayalan v. Att'y Gen.*, 997 F.3d 132, 137-38 (3d Cir. 2021) (quoting 8 U.S.C. § 1252(b)(4)(B)).

[10] *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017).

5

will be at least one central reason for persecuting" him or her.[11]   An applicant for withholding of removal must likewise satisfy the "one central reason" test.[12]   A motive may be "central" for asylum purposes even if other motives also played a large role in the applicant's persecution, so long as the proscribed motive was not "incidental, tangential, or superficial."[13]   An applicant who has been (or will be) "targeted out of a simple desire for money has not experienced," or shown that they will experience "persecution on account of a ground protected by the INA."[14]

Here, the BIA determined that Carbajal-Recinos and Carbajal-Duque had not met their burden of showing that their proposed particular social group, immediate members of the Carbajal family, would play a central role in any persecution they are at risk of suffering if removed to Honduras.   In particular, the BIA found that MS-13's extortion (and subsequent murder) of Isaias was motivated by the desire for his money, not by Isaias' family membership.   Likewise, the BIA concluded that MS-13's continued harassment of various Carbajal family members (including Petitioners) following Isaias' death was

---

[11] 8 U.S.C. § 1158(b)(1)(B)(i).

[12] *See Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 n.6 (3d Cir. 2015). The primary difference between the two forms of relief is that, while eligibility for asylum can be demonstrated based on a "reasonable possibility" of future persecution, withholding of removal is only available where persecution is more likely than not. *See Thayalan*, 997 F.3d at 139.

[13] *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 130 (3d Cir. 2009).

[14] *See Thayalan*, 997 F.3d at 144; *see also Shehu v. Att'y Gen.*, 482 F.3d 652, 657 (3d Cir. 2007) (affirming BIA's holding that persecution "motivated by a bare desire for money" cannot support an asylum or withholding claim).

6

economically motivated, and that any role played by the victim's familial status was, at most, incidental or tangential to that central aim.[15]

Nothing in the record compels us to reject the BIA's conclusion that, while horrifying, the murder of Petitioners' loved ones was motivated by lucre rather than by surname. Indeed, Carbajal-Recinos acknowledged that Isaias was targeted "because of extortion," Isais' son was targeted "because he was with Isais at the time of the murder," and Isais' wife was targeted because "she had money." Nor was it unreasonable for the BIA to find that the pillaging, harassment, and threats which both preceded and followed those murders were likewise profit-driven. Carbajal-Recinos' testimony that an unknown individual began inquiring into her whereabouts in Colon, and Carbajal-Duque's secondhand reports that gang-members had inquired into his family's location, while undoubtedly concerning, do not compel us to conclude that the BIA's assessment was unreasonable. This is particularly true because Carbajal-Recinos' parents, who are also members of their asserted social group, have remained in Colon throughout these asylum proceedings without being harmed.

Petitioners' contention that they were targeted out of concern that they might take vengeance on Isaias' killers, or that there was "a pattern and practice of gang members in

---

[15] As partial support for this conclusion, the BIA cited its prior holding in *Matter of M-R-M-S-*, 28 I&N Dec. 757 (BIA 2023). Subsequently, we decided in *Lopez v. Attorney General* that much of *M-R-M-S-*'s analysis relied on a subordination-based conception of nexus that was incompatible with the INA. 142 F.4th at 171-73. Although we remain concerned by the BIA's reliance on *M-R-M-S-*, we are ultimately persuaded, in light of the BIA's opinion and the administrative record as a whole, that this reliance did not implicate the portions of *M-R-M-S-* which *Lopez* rejected, and that remand is therefore not necessary.

Honduras of targeting family members of the individuals who they wish to harm,"[16] is not sufficient. The question is not whether Petitioners' interpretation is plausible, but whether it is "so superior relative to the agency's finding that no reasonable adjudicator could have found as the agency did."[17] Viewing the record as a whole, the BIA's conclusion easily clears this low standard.[18]

For the aforementioned reasons, the petition for review will be denied.[19]

---

[16] Pet. Br. 20.

[17] *See Alexander-Mendoza v. Att'y Gen.*, 55 F.4th 197, 207 (3d Cir. 2022) (cleaned up).

[18] Petitioners further challenge the IJ's determination that their proposed social group was not cognizable. We do not reach this challenge, because the BIA did not rely upon that determination in its decision. *See Myrie*, 855 F.3d at 515. We likewise do not address whether the Petitioners have adequately shown they are at risk of persecution if removed. Although Petitioners argue that the BIA "err[ed] in affirming the Immigration Judge's determination that there was no well-founded fear of future persecution," neither the IJ nor the BIA made any such determination. Instead, Petitioners were denied relief solely because, even assuming they would suffer persecution, that persecution lacked the requisite nexus to a protected ground.

[19] The Parties' joint motion to waive oral argument is denied as moot.